Jones, Chief Judge,
delivered the opinion of the court:
This Congressional reference case involves a number of claimants.[1] It was referred by this court, pursuant to Buie 45 (c), to the Honorable W. Ney Evans, a trial commissioner of the court, for the purpose of taking testimony, and with directions to make findings as to the facts and to submit a recommendation as to whether, under the applicable statutes, the “demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant[s]”.(28 U. S. C. § 2509).
After taking extensive testimony and considering scores of documents, Commissioner Evans has filed his findings and conclusions, which axe set out below, and which, with minor modifications, we have adopted.
The claims arise by reason of the explosion of a truckload of munitions enroute from the Charleston Ordnance Depot, South Carolina, to the Edgewood Arsenal, Maryland, via common carrier truck.
The cargo consisted of 40,000 burster charges, containing 5,600 pounds of tetryl and 2,400 pounds of TNT.
Pursuant to instructions, the carrier had delivered the truck to Army personnel for loading at the point of origin. The work of loading was performed, supervised, and inspected by Army personnel, then the cargo compartment was closed and sealed by them, and later the same day was delivered to the carrier’s employees for transporting to destination.
*275 While it was known that the cargo consisted of munitions, its extremely explosive nature was apparently not disclosed to the carrier’s employees.[2] A collision occurred at the junction of highways 70 and 301 that evidently was not due to any fault of the driver of the truck. An auxiliary tank of gasoline was broken by the impact and the spilled contents burst into flames. Approximately an hour and a half later a tremendous explosion occurred which made an oblong crater 40 feet wide, 50 feet long, and 25 feet deep. Six people were killed, 40 were injured and a considerable amount of property was destroyed.
During the intervening period between the collision and the explosion a number of people had gathered, and while some warning was given, no one seemed to have appreciated the extreme explosive nature of the cargo. The full details are set out in the findings.
When all the facts and circumstances are considered the question of legal liability of the United States is doubtful. However, in the broad sense of equitable claims, as set out in Burkhardt v. United States, 113 C. Cls. 658, 667, we agree with the conclusion of the trial commissioner. ' This position is strengthened by the policy laid down by the Congress in connection with the claims of the victims of the Texas City disaster. The issues in connection with the claims arising from that disaster were much the same as those involved here.

Becommendation

The court having approved the findings and recommendations of the commissioner concludes that the claims are equitable in nature and reports to the House of [Representatives, pursuant to 28 U. S. C. 2509, that there is equitably due from the United States to the claimants the amounts specified in the column headed “Payable” as listed in the table attached to the findings.
*276 Need, Justice (Ret.), sitting by designation; Madden, Judge; Whitaker, Judge; and Littleton, Judge, concur.
OPINION OF COMMISSIONER
This Congressional reference presents the claims of 189 plaintiffs for losses sustained on March 7,1942, when a truckload of munitions exploded on a North Carolina highway. Six persons were killed;-twoscore were injured; and extensive property damage was inflicted.
The Army had engaged a common carrier by motor vehicle to transport the load of munitions from Charleston Ordnance Depot to Edgewood Arsenal. In the course of night driving, a passenger car failed to heed a stop sign at a highway junction and collided with the truck. Gasoline was sprayed over the vehicles, and both caught fire. The two fire companies that responded from adjacent small towns were unable to quench the flames on the truck. A little less than two hours after the collision the munitions exploded, with the resulting havoc.
Immediately after the explosion suggestions were put forward that, in view of the extent of the damage, the United States should make good the losses, since it was the owner of the munitions. Legislation to authorize such relief was introduced in the 77th Congress,[3] then in session.
The unfortunate accident occurred just three months to the day after Pearl Harbor. The nation was engrossed in the war. Although the intuitive reaction of the Governor of North Carolina and some other public officials was that the United States, as the owner of the munitions, should bear the burden of these civilian losses, no clear policy in that respect had emerged. Civilians of other belligerents had suffered and were suffering casualties and losses along with their armed forces in the waging of total war. Neither the equities nor the policies of such a situation had emerged in this country.
The subcommittees of the Committees on Claims who considered the relief bills could come to no resolution. The Secretary of War disclaimed responsibility by the United *277 States based on legal liability. No court test of such liability was possible, because of the sovereign immunity from suit.
In August 1946, sovereign immunity from suit in ordinary negligence cases was waived by tbe Tort Claims Act.[4] Seven months later, in April 1947, the Texas City disaster killed 560 persons, injured nearly 1,000 others, and caused upward of 6,000 instances of property damage. Lawsuits, numbering 275 or more, were filed under the Tort Claims Act.
In May 1950, the decision of a test case (by the district judge sitting without a jury) found the United States guilty of actionable negligence and allowed recovery. The potential liability of the Government was then estimated at $200 million.
In August 1951, while the Texas City decision was pending on appeal in the fifth circuit, the House of Representatives referred to this court the North Carolina relief bill then before it.[5] In March 1952, ten years after the explosion of the munitions truck, the main petition in this case was filed.
In June 1952, the district court’s decision in the Texas City case was reversed by the court of appeals.[6] The Supreme Court granted certiorari,[7] and, in June 1953, affirmed the court of appeals.[8] A vigorous dissent was filed by the three justices who were in the minority.[9]
Meanwhile, in the instant case, conferences in the nature of pretrial proceedings were held, in an effort to advance the trial.
Under, the court’s rules Congressional reference cases are heard and determined as adversary litigation. The issues are joined in standard pleadings. Trials are subject to the rules of evidence. The record becomes the foundation for findings of fact. Conclusions are drawn from the application of the law to the facts. Judgment may follow if the *278 court has the requisite power in a particular case. Otherwise, its conclusions are reported to the Congress.
In this instance, the court lacks jurisdiction to enter judgment, because the action sounds in tort. Its function is to report to the Congress whether the claims are legal or equitable or for gratuities. Because, presumably, of the statutory provision relating to the court’s conclusions as to legal liability, counsel have insisted throughout this proceeding upon every right of adversary litigation. Twice the case has been before the court en bane on procedural points: once on plaintiffs’ motion for call; and once on plaintiffs’ motion for discovery.[10]
As a result of such protracted skirmishing, the case had not emerged from pretrial stages when the Congress, in 1955, provided relief for the victims of the Texas City disaster.[11]
Thereafter, trial was held.
Counsel have submitted fully documented requests for extensive findings of fact and carefully constructed briefs on the question of legal liability.
In the view held by the present writer, too much refinement of either the facts or the law serves in this instance only to confuse the issues. The situation calls, instead, for brevity and point.
Section 2509 of title 28, United States Code, in providing for Congressional refei’ences, directs this court to report—
* * * conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant.
Equitable claims are not limited to those derived from “principles of right and justice as administered by courts of equity” but include as well those derived from “the broader moral sense based upon general equitable considerations.”[12]
I think Congress should make provision for payment of the bulk of these claims for the same reasons that provision *279 was made for the payment of the claims of the victims of the Texas City disaster.
When it came to a statement of what those reasons were, even the responsible committees of Congress could not agree beyond the opening sentence of the relief act:[13]
The Congress recognizes and assumes the compassionate responsibility of the United States for the losses sustained by reason of the explosions and fires at Texas City, Texas, and hereby provides the procedure by which the amounts shall be determined and paid.
In my view, when the Congress recognized and assumed “the compassionate responsibility” for the losses sustained at Texas City, it established a precedent which is highly persuasive, if not conclusive, upon the disposition to be made here. The individual victims of the North Carolina explosion incurred pain, suffering, death, and property losses, as did the victims of the Texas City disaster, without fault on their part, from causes set in motion by the Government, and to an extent larger than that to which response could be made by any other individual or entity participating in the chain of events.[14]
Ordinarily, in Congressional reference cases, a conclusion favoring the imposition of legal liability is deemed to be, and probably is, more persuasive than any foundation of equitable considerations. The present case is an exception, in that equitable considerations predominate, for two reasons. The equities favoring payment, derived from “the broader *280 moral sense based upon general equitable considerations,” and therefore founded on moral suasion, would remain to support the disposition herein suggested, regardless of any conclusion that might be stated for or against the imposition of legal liability. In addition, an unusual degree of legalism is inherent in any conclusion for or against legal liability,[15] wherefore the equities of this situation command much greater unanimity of support than would any legal conclusion.[16]
Under these circumstances, and in keeping with judicial custom to refrain from deciding issues not essential to the disposition of the cause, the mandate of the reference will have been fulfilled if the court reports to the House of Representatives the following conclusions, which are hereby recommended:
1. That general equitable considerations favor payment in this case as a matter of public policy;
2. That these equitable considerations are independent of and more persuasive than any conclusion that might be stated for or against the imposition of legal liability; and
3. That there is equitably due from the United States to the claimants listed in the table in the findings of fact the amounts set opposite their names in the column headed “Payable”.
FINDINGS OF FACT
1. (a) On March 7, 1942, a truckload of munitions exploded on a North Carolina highway. Six persons were killed, several others were injured,[1] and the damage to property was extensive.
(b) The United States (acting through the Army) was the owner and shipper of the munitions. The truck was owned and operated by a common carrier by motor vehicle.
(c) Within a few weeks after the explosion a bill[2] was introduced in the House of Representatives for the relief of persons who had suffered losses as a result of the mishap.
*281 Similar relief bills were introduced in each of the next five Congresses.[3]
(d) On November 12, 1943, the Secretary of War, in a report to the Committee on Claims of the House of Representatives on H. R. 1916 (the relief bill of the 78th Congress), advised that “* * * the War Department * * * does not feel warranted in recommending favorable consideration of the bill.” The report contained the following statement :
* * * It is the view of the War Department that the transportation company, which ivas duly licensed by Federal authority as an authorized interstate commerce carrier of explosives over the route in question, was in the relationship of an independent contractor with regard to the United States, and in such premises there would seem to be no ground for holding the Government, occupying the position of shipper, legally responsible for damages resulting from incidents occurring while the goods were in carriage, in the absence of evidence that the munitions were improperly handled or prepared for shipment by employees of the Government.
(e) On August 10,1951, by Report No. 831, 82d Congress, the Committee on the Judiciary reported to the House of Representatives, with a recommendation “that the bill do pass,” H. Res. 319, to refer the relief bill then pending (H. R. 4584) to this court “pursuant to sections 1492 and 2509 of title 28, United States Code,” The report set forth the text of H. R. 4584 and the letter from the Secretary of War to the House Committee on Claims of the 78th Congress, and stated:
This [relief] bill has been pending before Congress for several years, and several subcommittees have been appointed to consider the claim. In view of the fact that many technicalities are connected with this claim, it was the opinion of this committee that it be referred to the Court of Claims for findings of fact.
(f) The House of Representatives passed H. Res. 319 on August 21,1951, and it was.transmitted to this court by the Clerk of the House on November 21, 1951.
*282 (g) All known claimants were notified by mail, pursuant to the rules of the court, and on March 24, 1952, a petition was filed in which 191 claims were listed.
2. The carrier (owner and operator of the truck) was a South Carolina corporation. The Interstate Commerce Commission had, on February 4, 1942, issued to the carrier a certificate of' convenience and necessity authorizing the transportation of explosives over the route here involved.
3. The contract of shipment under which the munitions were being transported was made between the carrier and the Charleston Ordnance Depot, an agency of the United States. The shipment originated at Charleston Ordnance Depot, Charleston, South Carolina. The destination was Edgewood Arsenal, Maryland.
4. The cargo consisted of 40,000 burster charges packed in boxes (250 to the box). Altogether it contained 5,600 pounds of tetryl and 2,400 pounds of TNT.
5. Prior to the loading of the munitions, Army personnel inspected the truck (consisting of tractor and semitrailer converted from refrigeration) and found it in satisfactory condition for carrying explosives in accordance with Interstate Commerce Commission regulations.
On the morning of March 6,1942, the carrier delivered the truck to Army personnel for loading. The boxes were stacked in rows and the rows were braced by timbers to prevent movement inside the cargo space. The work was performed, supervised, and inspected by Army personnel who then closed and sealed the cargo compartment. The truck was returned to the carrier’s employees in midaftemoon, and the trip was begun about 4 p. m., with the carrier’s employees in sole charge from point of origin to destination.
6. Dill Carter, the driver in charge, had been employed by the carrier for more than a year and had transported explosives for the past three months. Raymond Avery, relief driver, although qualified by experience as a truck driver, was new in the carrier’s employment and had had no previous experience in transporting explosives. These men were instructed by the carrier not to drive in excess of 35 miles per hour. The word “Rush” on the manifest was under *283 stood by them to mean .that they were not to stop en route to sleep.
7. At 1:15 a. m., March 7,1942, the truck, proceeding north on highway 301, reached the point at which east-west highway 70 makes a junction with highway 301. The junction consists of a long, sweeping curve by highway 70 from the north and east southward into highway 301. There was a “Stop” sign on highway 70 just northeast of the junction, which was intended to stop traffic proceeding west on highway 70, thereby yielding the right of way to traffic on highway 301.
As the truck, with Avery at the wheel, approached the junction, the lights of a car were visible on highway 70, and it was apparent to Avery that the car was in motion which, if continued, would result in a collision. Avery turned the truck to the left in an effort to avoid the oncoming car. His effort was unsuccessful. The car continued into highway 301 without stopping at the sign, and ran into the truck, striking it just at the rear of the cab or tractor.
The impact of the collision ruptured an auxiliary gasoline tank which was located on the side of the tractor at the rear of the cab. Whether or not the gasoline tank of the colliding car (a Pontiac sedan) also burst is not known. Gasoline was sprayed over the sedan and the cab of the truck, and both were immediately enveloped in flames.
8. Within 15 minutes or so after the collision two fire trucks (one from Smithfield, three miles south, and one from Selma, one mile north), an ambulance, a wrecker, and a highway patrolman were on the scene.
In the meantime, the driver and passengers of the Pontiac sedan were extricated from the burning wreck.[4] The two drivers of the munitions truck were unhurt, and assisted in the rescue operation.
9. Traffic was heavy at this point, even at such an early hour. Highway 301 was a main artery of north-south interstate traffic. Highway 70 was a main artery of east-west intrastate traffic.[5]
*284 The sustained volume of traffic was no doubt responsible for the settlement which had grown up at the highway junction. South of the junction fork and near the eastern rim of the north-south highway stood a small hotel (Tal-ton’s) with filling station and other accessory outbuildings. Across the way and a little to the south was Guirkin’s tavern, an all-night restaurant and oyster bar, and office for a tourist camp of the cabin variety which extended south from the tavern. The outbuildings of the tavern included a filling station, a utility shed, and a garage surmounted by apartments.
A cottage was located north of the fork of the junction and east of the north-south highway. Other buildings, barns, and sheds, and possibly other residences, were within the periphery of the settlement.
10. The Smithfield fire department, coming in from the south, concentrated its efforts on the burning sedan. The Selma fire department, arriving from the north, worked on the cab of the truck. The flames in the sedan were extinguished, but the Smithfield fire truck almost exhausted its water supply in the effort. The fire in the truck was quenched to the point where the firemen thought it was out. They could not be sure because of the rising steam and smoke. Intense heat had been created by the fire. The water in the Selma truck gave out, and the truck was withdrawn to the filling station at Guirkin’s tavern, where a brief but fruitless effort was made to renew the supply from a %-inch tap.
While the fire was dormant, the crew of the wrecker fastened chains to the truck and tried, unsuccessfully, to move it. As the effort was being made, one of the truck’s tires exploded, and flames again appeared. The man in charge of the wrecker ordered it disengaged from the truck. When that was done, he directed his crew to pick up the wrecked sedan [6] and tow it into Smithfield, which they did.
11. The evidence is not specific as to how long the firemen and others worked on the burning wreckage. Anywhere from 15 minutes to half an hour would be a reasonable esti *285 mate. By the time the flames reappeared on the truck, all of the workmen knew that the truck contained explosives, and they gradually withdrew to await the inevitable. One of the firemen, looking up from underneath the truck, had seen flames inside the cargo compartment, an area to which there was no access.
Before fire-fighting efforts were abandoned, one of the drivers (Avery) and one of the firemen separately examined the doors of the truck to see if access could be had to the inside. The fireman was prepared to throw a stream of water inside. Each man gave up the idea, not because of the potential danger, but because of reluctance to tamper with a Government seal.
12. The highway patrolmen stationed flares to warn and men to stop approaching traffic in all three directions. This procedure was customary in connection with any highway accident impeding the flow of traffic. In this instance, the fire was visible during the first 15 minutes or more. The men who were commissioned to stop cars were also advised that the truck contained explosives. Just what use they made of the information or the diligence with which they remained at their stations or performed their duties is not developed in detail by the evidence. Several cars and trucks did stop in each of the three approaches.
Soon after the highway patrolman arrived on the scene, one of the drivers told him the truck contained munitions, but the driver did not know what kind. The patrolman carried word to the proprietress of Talton’s hotel and no doubt told others, but there is no evidence of any effort on his part to emphasize the warning or to effect any kind of organized method of communicating it or making it effective by creating a sense of peril.
13. The firemen were all at work on the flames before they knew the truck contained explosives. When the fact did become known, they all remained unconcerned except the Smithfield fire chief. The tank on his truck then being almost empty, he ordered his men to take the truck down the highway and to remain with it. When they stopped before they had reached what he considered a safe distance, he ordered them to go farther. The fire chief himself remained *286 with, the burning truck for a few minutes and then withdrew to join his men. The Selma fire truck was later withdrawn to the same area, near Guirkin’s filling station.
14. Placards on the truck proclaimed that it contained explosives. Their significance if not their existence was lost on the spectators who first saw the fire and assisted in rescuing the occupants of the sedan.
Word was passed among the crowd, including the firemen, that one of the drivers had said the cargo consisted of 30-30 caliber bullets. Another report was circulated that one of the drivers had said that if the truck did explode, it would make just a puff of smoke. What the drivers, or either of them, actually said, if anything, is not established by the evidence, although the evidence does establish the fact that neither of the drivers knew what the truck contained beyond its being a cargo of munitions. Neither of them had any conception of the cargo’s explosive potential.
15. As the firemen withdrew from the immediate vicinity of the burning truck, most of the onlookers and other persons who had been milling about also withdrew. The facts were generally known among these people: that the truck was still burning; that it carried munitions; and that an explosion would probably occur. This was the situation half an hour, at least, before the explosion. No concerted warning, however, was given by anyone, although the two truck drivers, all of the firemen, and the highway patrolmen knew the facts hereinabove recited.
Two residents of Talton’s hotel, roused from sleep by the commotion following the collision, got up and investigated for themselves and then went back to bed, thinking the danger had passed. Four other persons stopped at Guirkin’s tavern for refreshments while the excitement was under way, then went across the highway, took rooms in the hotel, and retired.
A score (or more) of persons were in Guirkin’s tavern. The two fire crews stood by their trucks at Guirkin’s filling station. Others stood in the open in the same vicinity.
16. One hour and 42 minutes after the collision, at 2: 5T a. m., the munitions exploded.
*287 17. (a) The explosion left an oblong crater in the highway 40 feet wide, 50 feet long, and 25 feet deep.
(b) Six persons were killed, and twoscore were injured.
(c) Talton’s hotel was demolished.[7] Guirkin’s tavern was damaged, as were his filling station, his garage apartments, and some of his tourist cabins. The cottage north of the fork of the junction was wrecked and much of its furnishings damaged. Other buildings and cars and trucks within the range of heavy concussion suffered varying degrees of damage. Windows were broken within a radius of one mile, including the town of Selma. The blast was heard several miles away.
18. (a) Investigations followed: (1) by a Board of Officers convened at Charleston Ordnance Depot; (2) by a safety inspector employed by the Interstate Commerce Commission; (3) by an agent of the Federal Bureau of Investigation; (4) by an officer of the Navy; (5) by the coroner of Johnston County, North Carolina; (6) by a Special Committee appointed by the Governor of North Carolina; (7) by a Board of Officers convened at Fort Bragg; and (8) by the Interstate Commerce Commission.
(b) The Governor’s Special Committee listed the claimants and screened the claims, reducing the amounts thereof in some instances. As gauged by the evidence of record in the instant proceeding, the amounts listed by the Committee appear to have been uniformly conservative. The persons and amounts listed by the Committee were inserted in one or more of the relief bills introduced in the House of Representatives, including H. R. 4584, 82d Congress, referred to this court by H. Res. 319. The persons and amounts listed in H. R. 4584 were, in large measure, included in the main petition in this suit.
(c) The several investigations by Federal authorities confirmed the obvious: (1) that the drivers of the truck were unprepared to cope with the emergency, not having received instructions in that respect from either the carrier or the shipper;[8] (2) that adequate warning of the munitions’ ex *288 plosive potential would have saved lives and limbs and reduced property losses; and (3) that the auxiliary gasoline tank on the munitions truck could have been located in a more protected position.[9]
19. (a) All of the persons killed or injured had had some degree of warning.
Mrs. R. L. Holloman, proprietress of Talton’s hotel, had been told by the highway patrolman that the burning truck contained munitions, and that it might explode.
Willie Howell and Jesse Holloway, with Thelma Holloway and Bruce Hopewell, had passed the burning truck on their way in, and had stopped at Guirkin’s tavern for 20 or 30 minutes before going to the hotel.
Claude Mitchell had alighted from the vehicle in which he had been riding and was walking toward the truck when it exploded. He had been warned not to go nearer.
The car in which Cecil Propst and George Stroupe were riding drew opposite the burning truck just at the fateful moment. They had been stopped on the highway and warned against trying to pass.
Six of the eight persons listed above were killed. Thelma Holloway and Bruce Hopewell were among the injured, as were other guests and residents of the hotel.
Both of the drivers of the munitions truck were injured. Dill Carter was in Guirkin’s tavern, a site upon which Guirkin and one of the fire chiefs had agreed as an adequate shelter. Avery was in the open, near Guirkin’s filling station, and ran out into the highway to flag an approaching vehicle just as the explosion occurred.
The highway patrolman was one of the few persons at or near the scene who escaped injury.[10] Several of the firemen were hurt. Although they had withdrawn from the immediate vicinity of the burning truck, the force of the explosion proved that they had not withdrawn far enough to be out of harm’s way.
*289 (b)Lack of a sense of peril contributed to all of the deaths and injuries. The inference must be drawn from the evidence as a whole that if serious, informed, intelligent warning had been conveyed, none of the persons killed or injured by the explosion would have been so close to it. Common sense told those who knew the facts (that the truck, loaded with munitions, was still burning) to withdraw to a safe distance. As the event proved, what was a safe distance was a matter of informed judgment, and the facts on which to base such a judgment were unknown.
20. (a) Claims (195) and claimants (189) are listed in the table which appears at the end of finding 24.
(b) Two of the claims have been withdrawn: No. 106, Pearl Hester McCormick, and No. 168a, Mrs. Alberta Stroupe, Administratrix.[11]
(c) James Backstrom, claimant No. 9, was injured in the collision. There is no evidence of causal connection between his injuries and any act of defendant.
(d) Two of the claimants, Carolina-Norfolk Truck Line (No. 30), and Standard Coated Products, Inc. (No. 164), filed initially for property damage. Both subsequently received insurance payments, and their claims were transferred at the trial to the insurance subrogation group. The insurance companies were not named, and there is no evidence in support of the amounts of their claims.
(e) Eighteen of the claims represent the subrogation rights of insurance companies for payments made for losses resulting from the explosion.[12]
(f) Excluding the claims listed in the four preceding subsections of this finding, there remain 173 claims (of 167 claimants). Of the 173 claims, 6 are for wrongful death, 13 are for personal injuries, and 154 are for property damage.
21. (a) Counsel have stipulated[13] the amounts in 167 of *290 the 173 claims referred to in the preceding subparagraph, and defendant has seriously contested only one (Lloyd Guirkin, No. 70) of the remaining six. A determination has been made as to the amount of it, on the basis of the evidence.[14]
(b) The amounts listed in the table’s final column as “Payable” total $160,840.99. The six claims for wrongful death ($10,000 each: stipulated) total $60,000. The 13 claims (of 11 claimants) for personal injury total $20,323.95. The remaining $80,517.04 represents the total of the 154 claims for property damage.[15]
Two of the 154 claims for property damage were entered in amounts in excess of $25,000: Lloyd Guirkin, No. 70, $25,714.05; and Palph Taitón, No. 173, $26,446.35, for a total of $52,160.40. Upon the Government’s stipulation with Taitón (for $25,446.35) and the determination of Guirkin’s claim (at $17,500), the findings reflect a total of $42,946.35 for these, the two largest, and the only claims for property damage in excess of $5,000.
Nine of the remaining 152 property damage claims are in the range of $1,000 to $5,000, and together total $17,574.20.
Sixty-five of the remaining 143 claims for property damage fall into the range of $100 to $1,000, and total $16,274.49.
The final 78 claims for property damage are all below $100, and total $3,722.00.
22. (a) Losses made good by insurance have been eliminated from all of the claims grouped in the preceding finding.[16]
(b) The 18 claims presented separately by insurance companies [17] total $8,764.57. In ten of these claims the amounts were stipulated. In the remaining eight, the amounts have been determined from the evidence and appear under the table column headed “Established”.
*291 23. Judgments, each, in the amount of $500 (duly paid), were recovered against the carrier by the widows of the two men whose car reached the side of the burning truck at the moment of explosion (Propst, No. 135; and Stroupe, No. 168).
24. The table which follows (and which is hereby incorporated in this finding) contains an alphabetical listing of the claimants, numbered in sequence (with cross references to the numbers contained in the petition), and the type of loss in each claim. Columns of figures then show (1) the amount claimed, (2) the amount established, and (3) the amount payable.

*292

*293

*294

*295

*296

*297

*298 APPENDIX[1]
ACTIONABLE NEGLIGENCE
From, the standpoint of the law of negligence, the findings present two operative facts, both of them negative, and both reflecting acts of omission. One is the inadequacy of the warning. The other is the lack of effective direction, and therefore of results, in fighting the fire.
As stated in the findings, common sense would tell one to withdraw to a safe distance from a burning truck loaded with explosives; but in this instance, what was a safe distance was a matter of informed judgment, and the facts on which to formulate such a judgment were not known by any person present. The inadequacy of the warning stemmed from lack of knowledge of the explosive potential of the munitions. This lack of knowledge was also responsible for the failure of participants and bystanders, of residents and guests of Talton’s hotel, or patrons of Gruirkin’s tavern, and of travelers on the highway ever to realize, a sense of peril.
Informed judgment was likewise the element that was missing in the fire-fighting. Since the wreckages were not entangled, the burning sedan was not contributing to the fire on the truck. If the water capacity of the Smithfield tank had been directed onto the tractor of the truck, instead of being used on the sedan, the fire in and on the truck might have been quenched, leaving the sedan to burn itself out.
The Smithfield firemen simply took up what appeared to be the first job at hand, when they concentrated on the sedan. Such evidence as there is on the point indicates that the Smithfield fire chief did not know the truck contained explosives until his supply of water was almost exhausted. If he and the Selma fire chief had been accurately and fully apprised of the situation immediately upon their arrival, the outcome might well have been different.
Both of these omissions are encompassed in the failure of *299 the carrier and the shipper to see that someone on or with the truck knew the facts that would be necessary for intelligent, effective handling of an emergency.
The application of the law of negligence to these operative facts requires only reference to a limited number of guideposts.
Although the Tort Claims Act has no application, as a statute, to this case, the frame of reference here is described in its provisions for jurisdiction by the district courts of—
* * * civil actions, for money damages * * * for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.
For the determination of negligence, and whether or not liability would be imposed, the law of North Carolina governs.[2]
The question, then, is: Would a private person, if he had been the owner and shipper of the explosives, be liable to these claimants under the law of North Carolina if he and his employees had conducted themselves as did the Government through its officers and employees in this case?
Let the facts be transposed, therefore, to substitute for the United States, as the owner and shipper of the munitions, an individual (or a corporation).[3] Otherwise, the facts remain the same.
The law of negligence in North Carolina varies little from that of other common law jurisdictions. The foundation of it is a duty to exercise that degree of care which a reasonable man of ordinary prudence would exercise under the same or similar circumstances.[4] In order for liability to attach, defendant must have owed to plaintiff a duty to *300 exercise care; defendant must bave failed to discharge his duty; and his consequent negligence must have been the proximate cause of plaintiff’s loss or injury.[5]
The instant cargo of explosives would qualify under North Carolina law as a dangerous instrumentality. In dealing with dangerous instrumentalities the North Carolina decisions have been wary of degrees of care and doctrines of strict liability. The danger inherent in a cargo of explosives would be part of the circumstances for consideration in determining what was ordinary care.
It seems clear, from the decided cases, that North Carolina law would impose upon the owner and shipper of such a cargo a duty to exercise reasonable care, and that the duty would extend to all who might be on, along, or near the highways and other routes to be traversed. Reasonable care would require the owner and shipper to provide every reasonable facility and precaution for preventing accidents or for dealing with the consequences of any traffic or other mishap reasonably foreseeable, to forestall, if possible, the much greater damage that was bound to follow if the cargo should explode.[6]
The imposition of such a duty upon the owner-shipper would mean that he had not relieved himself of the obligation by the mere act of engaging an independent contractor (the carrier) to make the delivery. It is unnecessary to speculate on what the result might have been if the owner-shipper had taken precautions which the facts show he did not take: if he had told the carrier what he knew of the explosives’ potential; or if he had checked the carrier’s precautions and preparations for fighting fire or dealing with emergency situations arising from traffic mishaps; or if he had instructed the carrier’s employees in these matters; or if he had sent with the truck one of his own officers or em *301 ployees who possessed the requisite knowledge and skills. The owner-shipper did none of these things.[7]
The failure of the owner-shipper to take precautions of the kind described in the preceding paragraph represents a failure on his part to exercise ordinary reasonable care in sending into the stream of traffic a cargo potentially as dangerous as this one was, and as he, and he alone, knew it to be. Haring thus failed in his duty, he would be liable to these claimants under the law of North Carolina if his negligence was the proximate cause of their losses.
Causation, in the simple, factual terms of cause and effect, is obvious. The plaintiffs’ losses might have been averted if the owner-shipper had not failed to act. His omissions were therefore among the causes of the losses.[8]
Proximate causation involves elements other than cause and effect. The two ingredients for consideration here are remoteness and foreseeability.
In this case, as the Government contends, the losses were caused by the explosion; the explosion was caused by the fire; the fire was caused by the collision; and the collision was caused by the negligence of a third person. Plaintiffs contend for, and the findings confirm, the existence of still other causes, specifically, the owner-shipper’s acts of omission.
These latter causes became operative after the fire and before the explosion. While the explosion was the direct cause of the losses, the acts of omission were next in line. *302 They were, therefore, proximate rather than remote causes.[9]
Whether or not the plaintiffs’ losses were reasonably foreseeable as consequences of the owner-shipper’s acts of omission is the final question.[10]
The present writer has no hesitancy in giving an affirmative answer to the question. The collision which caused the fire was a traffic mishap. Traffic accidents are (and in 1942 were) about as foreseeable as death and taxes. In terms of city traffic, the Pontiac sedan ran through a red light and crashed into the truck. Gasoline was thrown over the colliding vehicles, and fire broke out. If there was anything unforeseeable about this sequence of events, it was that the truck, the innocent victim of the collision, was loaded with munitions; and this, the owner-shipper knew. He must have known, also, that fire would cause the munitions to explode, and that an explosion would cause personal and property losses.
The conclusion would follow that the individual (or corporation) who owned this cargo of explosives and who as owner sent it into the stream of highway traffic was guilty of actionable negligence under the law of North Carolina, and that he should respond in damages to persons who suffered losses as a result of the explosion.[11]

 Inasmuch as the plaintiffs are listed in alphabetical order in a table in the findings of fact, repetition of their names here would serve no useful purpose. The style of the case as established in the court’s records is therefore retained.

 Had the Federal Tort Claims Act, 60 Stat. 812, been in effect at the time of the explosion it is probable that there would have been a legal right to recover on the ground that it was the duty of defendant’s employees who loaded the cargo to explain to the carrier the exceptionally high explosive nature of the shipment, and that their failure to do so would have constituted actionable negligence under the act.

 Similar relief bills were offered in every succeeding Congress from the 78th through the 82d.

 The Act of August 2, 1946, 60 Stat. 843; 28 U. S. C. 1346 (b). The operation of the act tras subsequently limited to claims arising on and after January 1,1945.

 H. R. 4584, referred by H. Res. 319, 82d Congress.

 In re Texas City Disaster, 197 F. 2d 771.

 344 U. S. 873.

 Dalehite et al. v. United States, 346 U. S. 15.

 The division was 4 to 3. Four justices comprised a majority because two took no part in the consideration or decision of the case.

 Defendant objected to the production of documents in the possession of Government departments and agencies, for use either as evidence or for discovery. When the documents became available, defendant objected and still objects to their use in evidence.

 The Act of August 12, 1955, 69 Stat. 709.

 Burkhardt et al., v. United States, 113 C. Cls. 658, 667 (1949).

 This sentence was inserted by the conference committee as a substitute for the House amendment. House Report No. 1623, on S. 1077, 84th Cong., 1st sess. The House amendment had carried the following text: “While denying any equitable or legal responsibility on the part of the united States, but for compassionate reasons, and as a gratuity, it is the intention of the Congress to make payment * * House Report No. 1305, on S. 1077, 84th Cong., 1st sess. The foregoing language had been inserted by the House in lieu of the text that had passed the Senate: “* * * despite the highly explosive nature of the fertilizer, it was not so marked as to warn those who conducted its loading or handling.” Senate Report No. 684, on S. 1077, 84th Cong., 1st sess. In support of this text the Senate Report adopted the substance of an earlier report by the House Committee (Report No. 1386, 83d Cong., 2d sess., based on a review by a subcommittee especially appointed) wherein the House committee concluded that the Government was “* * * wholly responsible for the * » * catastrophe.”

 The North Carolina losses, from the standpoint of monetary values, reflected less than one-tenth of one percent of the Texas City losses: under $175 thousand, as compared with an estimated $200 million. The ratio of the totals, however, does not detract from or lessen the burden of the individuals.

 Reference is made to the appendix following the findings of fact, wherein the writer has set forth his conclusion with respect to legal liability.

 Witness the history of the Texas City disaster (1) through the courts and (2) through the Congress.

 Estimates made at the time placed the number of injured at 40.

 H. R. 7690, 77th Congress.

 78th Congress, H. R. 1916 and S. 161; 79th Congress, H. R. 2662; 80th Congress, H. R. 2092; 81st Congress, H. R. 2760; 82d Congress, H. R. 4584.

 The driver, Mrs. Minnie Lewis, later died of burns. Her husband and two children were Injured. Of the two marines who were passengers, one, James Bachstrom, was hurt.

 The rationing of gasoline had not begun in March 1942.

 The wreckage of the sedan was not entangled with the truck. The tractor of the truck had come to rest almost astride the highway, with its front pointing northeast. The sedan was a few feet away, a little south and east of the tractor.

 The -wreckage then caught fire.

 The regulations of the Interstate Commerce Commission required. certain instructions to be given to the drivers by the shipper as well as the carrier.

 The installation of the tank complied -with ICC regulations.

 The patrolman was just entering his car when the explosion occurred. Somehow he escaped the concussion of the blast. He darted into his car and remained there until the debris stopped falling. His car was considerably damaged.

 These numbers refer to the series numbering of the alphabetical listing in the tablé.

 Nos. 3, 6, 10, 28, 36, 46, 64, 73, 74, 116, 119, 120, 123, 139, 148, 162, 176, and 176.

 In so stipulating, counsel for defendant agreed only that the several losses were caused by the explosion and that the dollar amounts represent reasonable translation of the losses into monetary values. No concession was made In relation to any obligation, legal or equitable, on the part of the United States.

 The contest related to the amount, only. Defendant conceded that the loss was caused by the explosion.

 From a monetary standpoint the claims divide almost evenly between Injuries to the person and damage to property.

 The original claim of A. G. Boone Company (No. 21) included $22.50 which had been or was thereafter paid by insurance.

 Finding 20 (e), note 12.

 The appendix was prepared by Commissioner Evans. It is attached as a matter of information.

 Erie Railroad. Co. v. Tompkins, 304 U. S. 64.

 If private ownership of a cargo of munitions appears incongruous, let dynamite or other commercial explosives be substituted for the munitions.

 “The due care required in fixing responsibility for negligence is the rule of the prudent man. The standard is always that care which a reasonably prudent man should exercise under the same or similar circumstances.” Butler V. Allen, 233 N. C. 484; 64 S. E. 2d 561, 563 (1951).

 “Actionable negligence is the breach of duty of the party sought to be charged to exercise ordinary care for the safety of the plaintiff and others similarly situated, which proximately causes the injury alleged.” Holderfield V. Rummage Bros. Trucking Co., 232 N. C. 623; 61 S. E. 2d 904, 906 (1950).

 “Whenever one person is by circumstances placed in such a position towards another that anyone of ordinary sense who thinks will at once recognize that if he does not use ordinary care and skill in his own conduct with regard to those circumstances, he will cause danger of injury to the person or property of the other, duty arises to use ordinary care and skill to avoid such danger." Honeycutt v. Bryan, 240 N. C. 238; 81 S. E. 2d 653, 655 (1954).

 “The duty * * * stems from the primary obligation resting upon civilized human beings not to cause injury to another through disregard of their safety. The general rule is that one who authorizes the use of a potentially dangerous instrumentality in such manner or under such circumstances that it is likely to produce injury is held responsible for the natural and probable consequences of his act to any person injured who is not himself at fault. Known danger attendant upon a known use imposes obligation upon him who authorizes it.” Rulane Gas Co. v. Montgomery Ward & Co., 231 N. C. 270; 56 S. E. 2d 689, 693 (1949).

 There may be more than one cause of an effect and more than one effect of a cause. An act of omission may be a cause or the cause, as well as an act of commission. Cozart v. Hudson, 239 N. C. 279; 78 S. E. 2d 881 (1954). “It is sufficient on the issue of primary negligence * * * that the negligence on the part of the defendant was a proximate cause or one of the proximate causes of his injury, where the evidence also tends to show that the negligence of some other person or agency occurred with the negligence of the defendant in producing plaintiff’s injury.” Harris v. Montgomery Ward & Co., 230 N. C. 485; 53 S. E. 2d 536, 539 (1949).

 “There may be two or more proximate causes of an injury. These may originate from separate and distinct agencies operating independently of each other, yet if they join and concur in producing the result complained of, the author of each cause would be liable for the damages inflicted, and action may be brought against one or all as joint tort-feasors.” Tillman v. Bellamy, 242 N. C. 201; 87 S. E. 2d 253, 254 (1955); Riddle v. Artis, 243 N. C. 668; 91 S. E. 2d 894, 896 (1956).

 “The test of foreseeability as an element of proximate cause does not require that the tort-feasor should have been able to foresee the injury in the precise form in which it occurred. All that * * * is required * * * on the question of foreseeability, in determining proximate cause, is that in the exercise of reasonable care, the defendant might have foreseen that some injury would result from his act of omission, or that consequences of a generally injurious nature might have been expected.” Riddle v. Artis, 243 N. C. 668; 91 S. E. 2d 894, 897 (1956).

 It will be noted that the question of contributory negligence, as a possible bar to recovery, has not been reached. It is unnecessary to develop the matter in detail. Each of the persons hilled, and each of the persons injured, ignored some degree of warning. None, however, defied a serious warning of danger to life and limb. Considering the absence generally of any real sense of peril, no one otherwise entitled to recovery should be barred therefrom because of contributory negligence.