**LAND GRANTORS IN HENDERSON, UNION AND WEBSTER COUNTIES, KENTUCKY and Their Heirs, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 93–648X.

United States Court of Federal Claims.

June 22, 2006.

Mark Stephen Pitt, Wyatt Tarrant & Combs, LLP, Louisville, Kentucky; Nancie G. Marzulla, and Roger J. Marzulla, Marzulla & Marzulla, Washington, D.C., for Plaintiffs.

William James Shapiro, Washington, D.C., for Defendant, United States Department of Justice.

## MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

BRADEN, Judge.

■ On May 1, 2002, the United States Court of Federal Claims substantially revised the rule for class action certification to conform to Federal Rule of Civil Procedure ("FRCP") 23. *See* RCFC 23, Rules Comm. Note ("RCFC 23 has been completely rewritten. Although the court's rule is modeled largely on the comparable FRCP [23], there are significant differences."). RCFC 23 adopted the substantive criteria for certifying and maintaining a class action, set forth in *Quinault Allottee Ass'n v. United States,* 197 Ct.Cl. 134, 453 F.2d 1272 (1972), however, as *Barnes v. United States,* 68 Fed.Cl. 492 (2005) advised:

(i) the class must be large, but manageable; (ii) there must be a question of law common to the whole class; (iii) the common question of law must predominate over any separate factual issues affecting individual class members; (iv) the claims of named plaintiffs must be typical of the class; (v) the United States must have acted on grounds generally applicable to the whole class; (vi) the claims of many allottees must be so small that it is doubtful they would otherwise be pursued; (vii) the current plaintiffs must adequately and fairly protect the interests of the class without conflicts of interest; (viii) the prosecution of individual lawsuits must create a risk of inconsistent or varying adjudications. Consistent with the Committee Notes, various opinions view these factors as informing the prerequisites for class certification under RCFC 23. But, care must be taken lest the parallel to *Quinault* be carried too far, as the Committee Notes also indicate that the provisions of RCFC 23 are "modeled largely on the comparable [federal rule]." A careful comparison reveals that in some instances, RCFC 23 implicates factors not found in *Quinault,* e.g., whether "joinder of all members is impracticable," while in others, *Quinault* imposes conditions not found in RCFC 23, e.g., that there must be a common legal question[ ] that joins the class.

*Id.* at 494–95 (internal citations omitted).

■ To date, the United States Court of Federal Claims has issued seven opinions analyzing revised RCFC 23.[1] Although only two class actions have been certified since RCFC 23 was revised, class actions are not disfavored by the United States Court of Federal Claims. *See Barnes,* 68 Fed.Cl. at 493–501 ("If the proposition that class actions 'are disfavored' ever was valid, it certainly is no longer so now."). Decisions not to certify reflect only the faithful application of RCFC 23 by the trial court to the particular facts of the case at issue, nothing more.

For the reasons discussed herein, in this case, the court has determined that Plaintiffs have met the requirements of RCFC 23.

---

1. *See Filosa v. United States,* 70 Fed.Cl. 609 (2006) (granting certification); *Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States,* 69 Fed.Cl. 639 (2006) (denying certification); *Fisher v. United States,* 69 Fed.Cl. 193 (2006) (denying certification); *Jaynes v. United States,* 68 Fed.Cl. 747 (2005) (denying certification) (reconsideration denied at *Jaynes v. United States,* 69 Fed.Cl. 450 (2006)); *Barnes v. United States,* 68 Fed.Cl. 492 (2005) (granting certification); *Abrams v. United States,* 57 Fed.Cl. 439 (2003) (denying certification); *Testwuide v. United States,* 56 Fed.Cl. 755 (2003) (denying certification).

## RELEVANT FACTUAL BACKGROUND[2]

Shortly after the onset of World War II, the United States ("Government") acquired approximately 35,849.28 acres of land in the counties of Henderson, Union, and Webster, Kentucky to establish an Army training facility, that later was named Camp Breckinridge. Almost all of this property was owned by farmers who resided on this land, which had been in the same families for generations and, more importantly, on which they depended for their livelihood. On March 7, 1942, the Secretary of War authorized the first of six condemnation proceedings that were filed in the United States District Court for the Western District of Kentucky during 1942–1944. Once property became subject to condemnation proceedings, the landowners either could voluntarily negotiate a sale price with federal agents or require "just compensation" to be determined by a jury trial. The Government paid the landowners approximately $3,107,341 for fee simple title to all of the condemned properties, whether the price was negotiated or determined by a jury.[3]

By June 19, 1951, the Department of Defense ("DOD") became aware that substantial gas and oil reserves might be located under the condemned properties and transferred oversight of these reserves to the Department of the Interior ("DOI").[4] In August 1956, DOI's Geological Survey Office con-firmed the existence of substantial oil and gas reserves under the condemned properties that were being drained by producing wells adjacent to Camp Breckinridge. On March 15, 1957, two former landowners of this property, together with several local officials, sent a letter of protest to DOI when they learned that DOI planned to lease a tract of 190 acres on the east boundary of Camp Breckinridge to two private oil companies "to protect the United States against loss by reason of the drainage of the oil and gas deposits." The former landowners demanded that they receive the lease royalties and the right to repurchase their land, if it was declared surplus property. DOI summarily dismissed the protest. Subsequently, DOI received at least $1,833,815.73 in revenues from these leases during the period August 6, 1957–April 30, 1964.[5]

In December 1962, DOD declared Camp Breckinridge inactive and the land, together with the coal, gas, oil, and other mineral rights, were transferred to the General Services Administration ("GSA") for disposal as surplus property. On or about April 15, 1966, GSA sold the coal rights in 30,540 acres to the Tennessee Valley Authority for $7,410,000. In addition, GSA sold all of the gas, oil, and other mineral rights underneath the condemned properties to private companies for approximately $24,572,547.70.[6] For-

---

2. An expanded factual background of this proceeding until April 1, 2005 may be found in the court's Interim Report Regarding S. 794. *See Land Grantors v. United States*, 64 Fed.Cl. 661, 666–85 (2005).

3. *Compare* DX 64 at DOJ1198–99 (Nov. 2, 1962 Department of Army Disposal Report No. 92 stating that Camp Breckinridge consisted of 35,-849.28 acres acquired in fee simple for $3,107,341, plus $2,500 for easements on an additional 93 acres) *with* DX 77 at DOJ3463 (Nov. 26, 1962 Report of Excess Real Property stating that Camp Breckinridge consisted of 35,-684.99 acres); *with* June 9, 2004 Gov't Response to Pls.' Requests for Admission 22 at 11 ("Admit that the United States paid the total sum of $3,098,700.76 in acquiring the Property.").

4. *See* June 9, 2004 Gov't Response to Pls.' Requests for Admission 27 at 12.

5. *See* DX 183 at (Ex. 80) DOJ3569; *see also* JX 54 at DOJ1552. The Government has stated that these leases were transferred to other entities,

but, to date, the Government has not produced documents that show the name of the transferee or how much additional revenue the Government received after April 30, 1964. *See* Gov't May 26, 2004 Answer to Interrogatory 8 at 12; *see also* William J. Shapiro Decl., Ex. B at 2 (July 2, 2004 Certificate of Michael Dennis Daugherty, Attorney Advisor, Division of Mineral Resources, Office of the Solicitor, United States Department of the Interior: "The Document Management Unit of the Department's Executive Secretariat assisted in ... redacting ... information concerning the sales value of oil and gas production that is privileged commercial information confidential to the producers.").

6. *Compare* JX 48 at DOJ1537 (Jan. 18, 1965 letter to Representative Edward J. Gurney from Lawson B. Knott, Jr., GSA Administrator) ("The major portion of the mineral rights at Camp Breckinridge was offered for sale by sealed bid offering with the bid opening on April 15, 1965. The high bids received as a result of the offering total $31,982,547.70."), *with* June 9, 2004 Gov't Response to Pls.' Request for Admissions No. 23

mer landowners still living in the area were outraged when they learned that the Government was profiting from selling coal, gas, oil, and other mineral rights, in light of the fact that they were paid nothing for their coal, gas, oil, and other mineral rights or a *de minimus* amount for existing leases when their land was condemned in 1942–1944. This situation provoked one former landowner to file an ill-fated suit in the United States District Court for the Western District of Kentucky, on behalf of himself and other former landowners, that was dismissed on jurisdictional grounds before a class was certified or any discovery could be taken. *See Higginson v. United States*, No.2074 (W.D.Ky. Sep. 7, 1965) (unpublished). The appellate courts correctly upheld the trial court's jurisdictional ruling because the suit improperly was filed pursuant to the Surplus Property Act of 1944, 58 Stat. 765, a law that was repealed by the Federal Property and Administrative Services Act of 1949, 40 U.S.C. §§ 471, *et seq.*, well before the suit was filed. *Id.; see also Higginson v. United States*, 384 F.2d 504 (6th Cir.1967), *cert. denied*, 390 U.S. 947, 88 S.Ct. 1034, 19 L.Ed.2d 1137 (1968).

On or about August 24, 1967, GSA also sold coal rights on an additional 3,930 acres of the condemned properties.[7]

The manner in which GSA sold the condemned property also angered many of the former landowners, particularly those who were under the impression that the Government had promised to give them a right of first refusal, if the land was ever sold. To add insult to injury, the Government did not even attempt to provide individual notice to the former landowners of any of these events, even though members of Congress were promised that would occur. The reality is that the former landowners either did not know their farms could be repurchased or were financially prohibited from bidding, because GSA put the most desirable agricultural properties up for sale in parcels much larger than the size of the original farms. Between May 28, 1956–November 15, 1968, GSA sold the surface rights to 31,963 acres of the condemned properties for approximately $5,972,950. *See* Pls.' Pre-Trial Brief at 6; DX 183 (Ex. 85) at DOJ3580–82.

Sometime in 1968, following the United States Supreme Court's denial of *certiorari* in the *Higginson* case, a group of former landowners and/or their heirs formed the Breckinridge Land Committee ("the Committee") and turned to Congress to seek redress. After thirty-five years of effort, on April 19, 1993, S. 794 was introduced, "For the relief of land grantors in Henderson, Union, and Webster Counties, Kentucky, and their heirs." On October 19, 1993, S. 794 and S. Res. 98 (Resolution, Calendar No. 204) 103d Congress, 1st Session (Sept. 20, 1993) successfully were reported out of the United States Senate and forwarded as a Congressional Reference to the Chief Judge of the United States Court of Federal Claims.

S. 794 provided, in relevant part:

Section 1.  Authorization.

The Secretary of the Treasury is authorized and directed to pay, out of money not otherwise appropriated, to the individuals (and in any case in which such individual is deceased, the heirs of such individual) who sold their land in Henderson, Union, and Webster Counties, Kentucky, to the United States Government under threat of condemnation in order to provide the 35,684.99 acres necessary for the military

---

at 11 ("Admit that the United States sold the oil, gas and coal rights underlying the property for an aggregate sum of $31,752,544"), *with* June 11, 2004 Gov't First Supp. Response to Pls.' Requests for Admission No. 23 at 2 ("Based on the October 20, 1965 Form # 1686, prepared by the Government Services Administration ... the oil and gas rights were sold for an *aggregate* sum of $24,433,247 and the *total* coal rights were sold for an aggregate of $7,410,000. Hence, based on this document, the *total* for oil, gas, coal minerals was $31,843,247." (emphasis added)); *see also* June 9, 2004 Gov't Response to Pl. Requests

for Admissions No. 23 at 11 (stating that the "oil, gas and coal rights underlying the property [were sold] for an aggregate sum of $31,752,544.").

7.  To date, the Government has declined to produce documents that provide the name of the entity that purchased these rights or the amount of revenue received from GSA's August 24, 1967 sale of an additional 3,930 acres of coal rights under the condemned properties. *See* Court Ex. 3A; Court Ex. 3I; *see also* March 25, 2005 Order denying March 24, 2005 Motion to Limit Review to the Trial Record.

training camp known as Camp Breckinridge, the sum of $_____, such sum being in full satisfaction of all claims by such individuals against the United States arising out of such sale.

Section 2. Reason for Relief.

The individuals described in Section 1 assert that they were—

(1) promised they would be given priority to repurchase land sold by them if sold by the United States Government; and

(2) paid less than reasonable value due in part to the refusal of the United States Government to compensate the owners for mineral, oil and gas rights.

S. 794, 103d Cong. (1993).

S. Res. 98 directed the Chief Judge to "proceed ... in accordance with the provisions of sections 1492 and 2509 of title 28, United States Code, and report back to the Senate, at the earliest practicable date, giving such findings of fact and conclusions that are sufficient to inform Congress of the amount, if any, legally or equitably due from the United States to the claimants individually."

The 1942–1944 condemnation proceedings displaced hundreds of landowners, their children, elderly dependants, other relatives, and tenants who lived off the land. On January 12, 1994, when this case was filed in the United States Court of Federal Claims, only five of these original landowners were still alive. By the time of trial, only three were still living and not in good health. Nevertheless, despite the fact that firsthand witnesses were no longer available and the Government claimed no longer to be in possession of a substantial number of relevant documents, the evidence adduced at trial, primarily documents produced by the Government or in the public domain and testimony and documents relied on by the Government's experts, established by a preponderance of evidence a viable legal claim for which the former landowners and their heirs should be awarded compensation in an amount to be determined in the court's final disposition of this case.

## PROCEDURAL HISTORY RELEVANT TO CLASS CERTIFICATION[8]

On January 12, 1994, a Complaint was filed in the United States Court of Federal Claims, pursuant to jurisdiction conveyed by congressional reference statutes. *See* Compl. ¶ 1 (citing 28 U.S.C. § 1492 and 28 U.S.C. § 2509(c)); *see also* S. 794 103d Cong. (1993). On September 22, 1995, a First Amended Complaint was filed, also invoking jurisdiction under 28 U.S.C. § 1492 and 28 U.S.C. § 2509(c).

On September 22, 1995, Plaintiffs filed a Motion to Certify This Matter as a Class Action. On November 3, 1995, the Government filed an Answer and Opposition. On December 11, 1995, Plaintiffs filed a Reply. On December 23, 1997, the Honorable James F. Merow, then assigned as the Hearing Officer, denied Plaintiffs' Motion as:

> not feasible in this matter ... [as] it is necessary to establish the contemporaneous values of the parcels acquired, to compare the amounts paid, [which] must be accomplished on the basis of evidence addressed to the most profitable uses to which the specific land could probably have been put in the reasonably near future[.] Individual proof as to a claimant's status as a covered individual or heir under the reference is so necessary ... [I]t is not considered that the *Quinault [Allottee Ass'n v. United States,* 197 Ct.Cl. 134, 453 F.2d 1272 (1972)] criteria call for a class certification in this matter. Common questions do not predominate to the extent that a class action would be feasible or desirable. Class Action suits are disfavored in the United States Court of Federal Claims litigation.

*Land Grantors v. United States,* No. 93–648X (Cl.Ct. Dec. 23, 1997) Order at 2 (certain internal citations omitted).

On August 15, 2003, this case was reassigned to the undersigned judge. On September 8–10, 2004 and November 23, 2004, a trial was conducted, at which the parties' experts testified and numerous documents

---

**8.** A comprehensive procedural history of this proceeding until April 1, 2005 may be found in the court's Interim Report Regarding S.794. *See Land Grantors,* 64 Fed.Cl. at 685–95.

were admitted. Subsequently, when the court examined the testimony of the Government's experts in detail and exhibits submitted, it became apparent that the Government had not produced all documents relevant to the scope of S. 794, particularly as to Section 2(2):

> Section 2. Reason for Relief.
>
> The individuals described in Section 1 assert that they were . . .
>
> (2) paid less than reasonable value due in part to the refusal of the United States Government to compensate the owners for mineral, oil and gas rights.

*Land Grantors,* 64 Fed.Cl. at 666 (quoting S. 794, 103d Cong. (1993)). Accordingly, the court requested and the Government produced additional documents to supplement the record, albeit under protest.

On April 1, 2005, the court issued an Interim Report Regarding S. 794 and Memorandum Opinion, wherein the court determined that the 1942–1944 contracts at issue for the sale of land were based on a mutual mistake by the parties that no coal, gas, oil, and other mineral deposits existed under the condemned properties that would support exploration or operations. *See Land Grantors,* 64 Fed.Cl. at 703–08 (citing RESTATEMENT (SECOND) OF CONTRACTS § 152 (1981)). The court also determined that the former landowners were entitled to restitution from the proceeds of the subsequent sale, lease, or easement of such coal, gas, oil, and other mineral deposits and that the Government's asserted defenses of preclusion, statute of limitations, and laches were inapplicable under the unique and *sui generis* facts of this case. *Id.* at 709–17. Accordingly, the court afforded Plaintiffs the opportunity to file a Second Amended Complaint to conform to the evidence adduced at trial and thereafter. *Id.* at 703. In addition, the parties were requested by a Show Cause Order to brief why the court should not enter a final judgment under 28 U.S.C. § 1491(a) and stay the congressional reference.

On October 3, 2005, a Second Amended Complaint was filed, pursuant to RCFC 15(b), re-listing 1,011 plaintiffs identified in the September 22, 1995 First Amended Complaint, invoking the jurisdiction of the United States Court of Federal Claims under the congressional reference statutes, 28 U.S.C. § 1492 and 28 U.S.C. § 2509, as well as the Tucker Act, 28 U.S.C. § 1491, and conforming the allegations to the evidence adduced at the trial and thereafter. *See* Second Am. Compl. The Second Amended Complaint, however, continued to assert that this case was a class action, despite Judge Merow's December 23, 1997 Order, denying Plaintiffs' Motion to Certify. *Id.* ¶ 6. Plaintiffs, however, did not request that the court reconsider the December 23, 1997 Order denying class certification.

On November 3, 2005, the Honorable Francis M. Allegra issued an Order that provides a comprehensive analysis of the requirements for class action certification in the United States Court of Federal Claims, in light of the significant revision of RCFC 23 on May 1, 2002. *See Barnes,* 68 Fed.Cl. at 493–501. Significantly, Judge Allegra concluded: "If the proposition that class actions 'are disfavored' ever was valid, it certainly is no longer so now." *Barnes,* 68 Fed.Cl. at 502.

Therefore, on December 29, 2005, the court issued a Memorandum Opinion and Order Regarding Reconsideration of Senior Judge Merow's December 23, 1997 Order Denying Class Certification in light of the May 1, 2002 revision of RCFC 23, the evidence adduced at the trial and thereafter, and the court's ruling that the April 15, 1965 filing of the *Higginson* suit as a class action, even though it was never certified, was sufficient to allow equitable tolling of the statute of limitations. *See Land Grantors,* 64 Fed. Cl. at 714 (citing *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990)). In addition, the court requested a statement of the requirements for class membership and a proposed course of action for meeting the notice requirement of RCFC 23(c). *See, e.g., Barnes,* 68 Fed.Cl. at 502–03. The court also requested that the law firm of Marzulla & Marzulla, P.A., of Washington, D.C., which filed as Of Counsel for Plaintiffs on the October 3, 2005 Memorandum Order to Show Cause, submit evidence of the ability to serve hereafter as class counsel. *See* RCFC 23(g)(1).

On January 31, 2006, Plaintiffs filed a Motion to Reconsider Class Certification. *See* Pls. Mot. to Recon. On January 31, 2006, the Government filed a Response that certification was neither "warranted[,] nor appropriate[.]" Gov't Resp. at 22; *see also id.* at 7–10. On February 14, 2006, the Government also filed a Motion to Strike Claimants' Motion to Reconsider Class Certification or, in the Alternative, [a] Motion to Stay Briefing on Claimants' Motion to Reconsider Class Certification. On March 2, 2006, Plaintiffs filed an Opposition to the Government's February 14, 2006 alternative motions. On March 16, 2006, the Government filed a Reply.

## DISCUSSION

### A. Jurisdiction.

■ It is well established that the court has authority to reconsider prior rulings before the entry of a final judgment. *See Marconi Wireless T. Co. of Am. v. United States,* 320 U.S. 1, 47–48, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943) (holding that the trial court had the power, "at any time prior to entry of its final judgment ... to reconsider any portion of its decision and reopen any part of the case.") (citations omitted); *see also Wolfchild v. United States,* 68 Fed.Cl. 779, 784 (2005) ("At an interlocutory stage, the common law provides that the court has power to reconsider its prior decision on any ground consonant with application of the law of the case doctrine.") (citations omitted); *Florida Power & Light Co. v. United States,* 66 Fed.Cl. 93, 96 (2005) ("The decision to grant or deny a motion for reconsideration under the Federal Rule lies largely within the discretion of the trial court.") (citation omitted). In light of the amendment to RCFC 23 after the entry of Senior Judge Merow's December 23, 1997 Order Denying Class Certification and the court's well-reasoned decision in *Barnes,* the court has decided to reconsider entry of the December 23, 1997 Order.

### B. Standing.

To establish injury in fact, a plaintiff must have suffered: "an invasion of a legally protected interest which is (a) concrete and particularized *and* (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (emphasis added) (internal citations omitted). In this case, Plaintiffs had "legally protected interests" in their former land, including coal, gas, oil, and other mineral rights and the 1942–1944 contracts with the Government that were "invaded" or adversely affected. *See Tenn. Elec. Power Co. v. Tenn. Valley Auth.,* 306 U.S. 118, 138, 59 S.Ct. 366, 83 L.Ed. 543 (1939) (holding that a claim based on the invasion of a legal right includes "one of property [and] one arising out of contract"). The burden on Plaintiffs is to evidence "specific facts," establishing that a recovery is "concrete" and "particularized." *See Defenders of Wildlife,* 504 U.S. at 560–61, 112 S.Ct. 2130. As discussed herein, Plaintiffs have met both of these standing requirements in this case.

### C. Standard For Granting Class Certification Under RCFC 23.

Class actions initiated in the United States Court of Federal Claims may be granted: "only if (1) the class is so *numerous* that joinder of all members is impracticable, (2) there are questions of law or fact *common* to the class, (3) the claims of the representative parties are *typical* of the claims of the class, and (4) the representative parties will fairly and *adequately protect* the interests of the class." RCFC 23(a) (emphasis added). In addition, a class action may only proceed when:

(1) the United States has *acted or refused to act on grounds* generally applicable to the class; and

(2) the court finds that the *questions of law or fact common to the members of the class predominate* over any questions affecting only individual members, and that a *class action is superior to other available methods* for the fair and efficient adjudication of the controversy.

RCFC 23(b) (emphasis added).

The requirements of RCFC 23(a) and (b) "can be grouped into five categories: (i) **numerosity**—a class so large that joinder is

impracticable; (ii) **commonality**—in terms of the presence of common questions of law or fact, the predominance of those questions, and the treatment received by the class members at the hands of the United States; (iii) **typicality**—that the named parties' claims are typical of the class; (iv) **adequacy**—relating to fair representation; and (v) **superiority**—that a class action is the fairest and most efficient way to resolve a given set of controversies." *Barnes,* 68 Fed.Cl. at 494 (emphasis in original) (citing *Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (same regarding FED. R. CIV. P. 23(a), (b)); *Testwuide,* 56 Fed.Cl. at 761). Since these requirements are in the conjunctive, failure to satisfy any one "is fatal to class certification." *Id.*

■ The party moving for class certification bears the burden of satisfying the requirements set forth in RCFC 23 by a preponderance of the evidence. *See Barnes,* 68 Fed.Cl. at 495 ("Plaintiffs bear the burden of establishing that the action satisfies these requirements.") (citing *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 613–14, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)); *see also Belle v. Jefferson–Pilot Life Ins. Co.,* 2006 WL 335892 (4th Cir.2006) (discussing FRCP 23) ("It is not the defendant who bears the burden of showing that the proposed class does not comply with the class action rule, but rather it is the plaintiff who bears the burden of showing that the class does comply with the rule.").

■ In determining whether the requirements of RCFC 23 are met, however, the court should not consider "whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of the class action rule are met." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *see also Falcon,* 457 U.S. at 161, 102 S.Ct. 2364 ("With the same concerns in mind, we reiterate today that a Title VII class action, like any other class action, may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."). At this juncture, the trial court only must assume the truth of the factual assertions in the complaint. *See Barnes,* 68 Fed. Cl. at 495.

## D. The Court's Resolution Of Plaintiffs' Motion For Class Certification.

### 1. The "Numerosity Requirement."

■ The "numerosity requirement" is satisfied if the proposed "class is so numerous that joinder of all members is impracticable[.]" RCFC 23(a)(1). Several factors determine numerosity including, but not limited to: "the size of the class, ... the facility of making service upon them if joined, and their geographic dispersion." *Kilgo v. Bowman Transp., Inc.,* 789 F.2d 859, 878 (11th Cir. 1986) (discussing FED.R.CIV.P. 23).

As the caption of this case establishes, the proposed class includes over 1,000 known plaintiffs, and, before the case is final, that number may increase. This fact alone supports the numerosity requirement. *See Barnes,* 68 Fed.Cl. at 495 ("[T]he class in question ... potentially numbers in the thousands, ... so numerous that joinder of all members is impracticable."); *see also Bacon v. Honda of Am. Mfg., Inc.,* 370 F.3d 565, 570 (6th Cir.2004) ("[The] sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy Rule 23(a)(1).").

Joinder in this case, however, is not only impracticable, but impossible, because each landowner conveyed title in their property to the Government under separate contracts. *See* RCFC 20(a) (requiring "(i) a right to relief must be asserted by, or against, each plaintiff or defendant, relating to or arising out of the *same transaction or occurrence,* and (ii) some question of law or fact common to all the parties will arise in the action." (emphasis added)). " 'Same' in this regard does not mean 'similar.' " *Barnes,* 68 Fed.Cl. at 495 (citing *Franconia Assocs. v. United States,* 61 Fed.Cl. 335, 337 (2004)) ("[W]ell-known canons of construction suggest that the term 'same' must be construed consistently [in this court's rules], with the result that the term in the latter rule cannot mean 'similar.' "). Although Plaintiffs' individual claims are similar to those of the proposed class, they do not arise out of the exact

"same transaction or occurrence." *Id.* (holding that the claims of individual government employees for premium pay were similar but not the "same" for the purposes of RCFC 20(a)). Accordingly, although RCFC 23(a)(1) only requires that joinder "be impracticable, not impossible," the latter is the case here. *Id.* (citing *Robidoux v. Celani,* 987 F.2d 931, 935 (2d Cir.1993) ("Impracticable does not mean impossible.")).

RCFC 23(a)(1) requires only that "the class is so numerous that joinder of all members is impracticable." RCFC 23(a)(1). Manageability of a proposed class is more properly a consideration under the requirement that, "a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy." RCFC 23(b).[9] Accordingly, the court has determined that the "numerosity" requirement of RCFC 23 has been satisfied in this case.

### 2. The "Commonality Requirement."

■ The "commonality requirement" entails three inquiries: whether there are "questions of law or fact common to the class;" whether those common questions "predominate over any questions affecting only individual members;" and whether the "United States acted or refused to act on grounds generally applicable to the class." RCFC 23(a)(2), (b)(1), (b)(2). To ascertain whether the "commonality requirement" is met, the court must "seek to develop an understanding of the relevant claims, defenses, facts and substantive law." *Barnes,* 68 Fed.Cl. at 496 (citing *Falcon,* 457 U.S. at 160, 102 S.Ct. 2364); *see also Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) ("[T]he class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'").

#### a. Question Of Law Or Fact Common To The Class Exists.

RCFC 23(a)(2) requires that there be "questions of law or fact *common* to the class." RCFC 23(a)(2). This requirement is satisfied when there is at least "one core common legal question that is likely to have one common defense," the resolution of which will affect all or a significant number of the putative class members. *See Fisher,* 69 Fed.Cl. at 199–200 (citing *Forbush v. J.C. Penney Co., Inc.,* 994 F.2d 1101,1106 (5th Cir.1993) ("The interests and claims of the various plaintiffs need not be identical. Rather, the commonality test [of FED.R.CIV.P. 23(a)(2) ] is met when there is at least one issue whose resolution will affect all or a significant number of the putative class members." (internal quotation and citation omitted))). The threshold of commonality under RCFC 23(a)(2), however, is "not high." *Id.* (quoting *Jenkins v. Raymark Indus.,* 782 F.2d 468, 472 (5th Cir.1986) (same re: FED. R.CIV.P. 23(a)(2))).

In this case, Plaintiffs seek to represent a class of former landowners who sold their land in Henderson, Union, and/or Webster Counties, Kentucky during 1942–1944 to the Government under the threat of condemnation, in order to provide the 35,684.99 acres necessary to establish the military training camp known as Camp Breckinridge. The evidence proffered at trial established that the basic factual assumption common to these former landowners and the Government was that no coal, gas, oil, and other mineral deposits existed under the condemned properties that would support exploration or operations. *See Land Grantors,* 64 Fed.Cl. at 703–06. The common question of law is that the parties' mutual mistake had a material effect on the agreed exchange of performance. *Id.* at 706–07 (citing RESTATE-MENT (SECOND) OF CONTRACTS § 152 (1981)). In addition, there are three other questions of law common to the proposed class: whether the decision in *Higginson v. United States,* No.2074 (W.D.Ky. Sep. 7, 1965) (unpublished), 384 F.2d 504 (6th Cir.1967), *cert. denied,* 390 U.S. 947, 88 S.Ct. 1034, 19

---

9. The "ease" of identifying members and ascertaining their addresses is a factor in determining the practicability of joinder. *See Kilgo,* 789 F.2d at 878. Under RCFC 23, however, this factor is of less import, because class actions in the United States Court of Federal Claims are limited to the opt-in variety. *See* RCFC 23(c)(2)(B) ("[T]he court will include in the class any member who requests inclusion[.]").

L.Ed.2d 1137 (1968), has a preclusive effect in this case; whether the doctrine of equitable tolling should be invoked; and whether the doctrine of laches is applicable. *Id.* 709–17.

Since there are both questions of law and fact common to the class, the court has determined that the "commonality" requirement of RCFC 23(a)(2) is satisfied. *See Barnes,* 68 Fed.Cl. at 496 (citing *Armstrong v. Davis,* 275 F.3d 849, 868 (9th Cir.2001)) ("[C]ommonality is satisfied [under FED. R. CIV. P. 23(a)(2)] where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members. In such circumstance, individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality.").

### b. The Common Questions Of Law Or Fact Predominate Over Questions Affecting Individual Members.

An additional requirement is that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." RCFC 23(b)(2). This inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" and "is far more demanding," than RCFC 23(a)(2). *See Amchem Prods., Inc.,* 521 U.S. at 623–24, 117 S.Ct. 2231 ("Even if [FED. R. CIV. P. 23](a)'s commonality requirement may be satisfied by that shared experience, the predominance criterion is far more demanding.").

The Government apparently decided, for strategic reasons, not to provide the court with analysis of each of the individual elements of RCFC 23(a)(2), but rather argued that "individual liability and damage questions" preclude certification. *See* 1/31/06 Gov't Response at 9. Instead, the Government suggests that "the appropriate solution would be to require each individual claimant to sue individually." *Id.* In light of the fact that this case has been pending since 1994, all original Plaintiffs appear now to be deceased, and an evidentiary hearing was conducted to determine liability and damages in 2004, the court considers the Government's suggestion to be not responsive or responsible. *Id.; see also* 2/14/06 Gov't Motion to Strike Claimants' Motion to Reconsider Class Certification or, in the Alternative, Motion to Stay Briefing on Claimants' Motion to Reconsider Class Certification; 3/16/06 Gov't Reply in Support of 2/14/06 Motion.

The court, however, is mindful that issues of the precise damages owed individual members of the proposed class may arise. In *Taylor v. United States,* 41 Fed.Cl. 440 (1998), the United States Court of Federal Claims confronted this same issue and took a pragmatic perspective:

> In cases where a money judgment is sought against the United States, the court requires individual proof of the amount of money damages. This requirement is based on the belief that only individual plaintiffs can meet the burden of proof for damages when there is a waiver of sovereign immunity, which is always present in this court. While a valid concern, this rationale principally implicates the determination of money damages. In this case, the court can certify the class to determine whether the government is liable to class members[.] Later, if necessary, the court can use a formula to determine damages for individual class members. If the determination of damages becomes too speculative or encumbered by individual factual issues, the court can decertify the class for the determination of money damages.

*Id.* at 444 (internal citations omitted). If the need for individual damages calculations was determinative, "there scarcely would be a case that would qualify for class status in this court." *Id.; see also Barnes,* 68 Fed.Cl. at 498 ("And while defendant stresses that each class member individually would have to prove his or her damages with particularity, its is noteworthy that this court has employed damage estimations in other cases, and conceivably could employ similar principles here." (citing *Franconia,* 61 Fed.Cl. 718, 770 & n. 93 (2004)) (discussing the jury verdict method of establishing damages); *Health Ins. Plan of Greater N.Y. v. United States,* 62 Fed.Cl. 33, 43–47 (2004) (extrapo-

lating damages derived from samples of computer data)).

At this juncture, the court has determined that the common questions of law and fact in this case predominate over issues that may later arise in determining the precise damages owed individual members of the proposed class. It is premature, however, to assume that individual determination of damages will be problematic. In effect, Plaintiffs have proposed the appointment of a Special Master to make individual monetary determinations and distributions. The court need not consider the merits or logistics of this proposal at this time, since the Government might propose a methodology for ascertaining and distributing damages that will be more efficient. If individual damage determinations is impaired by the existence of a class, the court may de-certify any time before a final judgment. *See* RCFC 23(c)(1)(C).

### c. The United States Has Acted On Grounds Generally Applicable To The Proposed Class.

A class action also may only be maintained where "the United States has acted . . . on grounds generally applicable to the class." RCFC 23(b)(1). In this case, the Government required two negotiators from the Department of Real Estate to attest on the Certificate of Inspection and Possession for each condemned property that: "to the best of my information and belief after diligent inquiry and physical inspection of said premises there is no evidence whatever of any . . . exploration or operations whatever for the development of coal, oil, gas or other minerals on said lands[.]" *Land Grantors*, 64 Fed. Cl. at 704 (quoting DX 541 at CHI–002–A015–0015); *see also* DX183 (Direct Testimony of Government's Expert, Dr. Jay L. Brigham (Ex. 46)) (Record of Tract E–489, GSA Records, Chicago–FRD). Accordingly, the record establishes that the Government has acted on grounds generally applicable to the class.

For these reasons, the court has determined that all three elements of the "commonality" requirement have been met in this case.

### 3. The "Typicality Requirement."

In addition, the claims of the representative parties must be "typical of the claims of the class." RCFC(a)(3). The threshold for "typicality" also is not high. *See Fisher*, 69 Fed.Cl. at 200 ("The threshold requirement for typicality is also not high.") (citing *Shipes v. Trinity Indus.*, 987 F.2d 311, 316 (5th Cir.1993); *Berkley v. United States*, 45 Fed.Cl. 224, 232 (1999) ("In the past, the typicality requirement in the *Quinault* test has not been found to be unusually restrictive.")).

In this case, Plaintiffs have established that the claims asserted by the proposed representative parties, *i.e.*, Robert Bruce, Carl Culver, Dr. John Johnson, Ruby Higginson, Thomas Luckett, Isaac Pritchett, Barbara Morgan, Keith Hendrickson, and Bill Lansden, are typical of the claims of the proposed class in that each is an heir to a tract of land located in Henderson, Union, or Webster Counties, Kentucky, that was condemned by the Government in 1942–1944 and sold for the purpose of establishing Camp Breckenridge.

### 4. The "Adequacy Requirement."

The representative parties also must "fairly and adequately protect the interests of the class." RCFC 23(a)(4). A threshold inquiry is whether class counsel is "qualified, experienced and generally able to conduct the litigation." *Barnes*, 68 Fed.Cl. at 499 (quoting *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir.1992)). In this case, Plaintiffs have submitted a declaration that the law firm of Marzulla & Marzulla, P.A. has substantial expertise in representing plaintiffs in class actions and litigating complex litigation in both the United States Court of Federal Claims and the United States Court of Appeals for the Federal Circuit. *See* 1/31/06 Decl. of Nancie G. Marzulla, Esquire ¶¶ 2–8. Moreover, Marzulla & Marzulla "possesses both the expertise and the resources to vigorously represent the class of claimants in this case as class counsel." *Id.* ¶ 9. In addition, Plaintiffs have submitted a declaration that the law firm of Wyatt, Tarrant & Combs, LLP has

**626**

represented Plaintiffs in this case since approximately June 1994 and also have substantial litigation experience. *See* 1/30/06 Decl. of M. Stephen Pitt, Esquire.

The second inquiry is whether Plaintiffs and the proposed class members are free from conflicting interests. *See Barnes*, 68 Fed.Cl. at 499 ("[C]lass members must not have interests that are antagonistic to one another, serving to uncover conflicts of interest between named parties and the class they seek to represent." (internal citations omitted)). The Government does not identify any actual or potential conflicts of interest that would place the representation of Plaintiffs at issue with other members of the proposed class and the court otherwise has perceived no conflict. Therefore, Plaintiffs have satisfied the second inquiry of the "adequacy requirement" of RCFC 23(a)(4). In addition, the affidavits state that Plaintiffs are "committed to vigorously prosecut[ing] this case and represent[ing] the proposed class." *Id.*

The Government also does not challenge either the qualifications or ability of Plaintiffs' counsel adequately to represent the class, Plaintiffs' commitment to prosecuting the case, or suggest that the nature of the claim entails inherent conflicts of interest between class members. To the extent that the Government is concerned about unidentified class members, those concerns ignore the distinction between FRCP 23 and RCFC 23, *i.e.*, that the later provides only for opt-in class actions. For these reasons, the court has determined that the "adequacy requirement" of RCFC 23(a)(4) has been met in this case.

5. **The "Superiority Requirement."**

A class action must also be "superior to *other available methods* for the fair and efficient adjudication of the controversy." RCFC 23(b)(2) (emphasis added). Under FRCP 23, the "superiority requirement" is met when "a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *See Barnes*, 68 Fed.Cl. at 499 (quoting FED.R.CIV.P. 23 Advisory

Comm. Note (1966 amendment, subdivision (b)(3))). RCFC 23 recites a similar list of factors: "[U]nder this prong of the analysis, the court is obliged to conduct a cost/benefit analysis, weighing any potential problems with the manageability or fairness of a class action against the benefits to the system and the individual members likely to be derived from maintaining such an action." *Id.*

Given that joinder under RCFC 20(a) is not possible in this case, the "superiority" analysis is limited to a comparison between the benefits of individual litigation versus those of a class action. Since this litigation is near completion, any problems with management or fairness are not at issue. Moreover, the Government will suffer no prejudice from certification and certification is a superior method of presenting the case for appeal or further consideration by Congress. *See* RCFC App. D–1 ("The RCFC, to the extent feasible, are to be applied in congressional reference cases.").

**CONCLUSION**

For these reasons, the Plaintiffs' Motion for Class Certification is **GRANTED**.

The Plaintiff class will consist of persons or, in any case in which such individual is deceased, the heirs of such individual:

1. who sold land in Henderson, Union, and/or Webster Counties, Kentucky during 1942–1944 to the Government under the threat of condemnation, pursuant to a contract, in order to provide the 35,684.99 acres necessary to establish the military training camp known as Camp Breckinridge;

2. who executed an Affidavit of Vendor that included the following, or substantially the following, language representing:

That there are no explorations or rentals being paid whatever for the development of coal, oil, gas or other minerals on said lands, that there are no outstanding rights under the terms of any oil, gas, coal or other mineral leases appearing of record for the reason that no rentals under any oil, gas or mineral leases have been paid to those vendors within the

past 9 months, nor to any predecessor in title within the past 10 years; that no oil, gas or mineral well was drilled on said premises as provided by the terms of said leases; that oil, gas or mineral leases are void, and all rights thereunder forfeited for the reason of non-performance on the part of the lessee or his (their) assigns to pay rental, or drill wells according to the terms of said leases, that no exploration for oil, gas or minerals are being conducted on said premises at this time, and that there are no oil wells on said premises; and

3.  who were within the prospective class sought to be certified, but were not named as a party or in privity to a named party in *Higginson v. United States,* No.2074 (W.D.Ky. Sep. 7, 1965) (unpublished), 384 F.2d 504 (6th Cir. 1967), *cert. denied,* 390 U.S. 947, 88 S.Ct. 1034, 19 L.Ed.2d 1137 (1968).

The claim for determination is whether the "basic assumption" on which members of the class and the Government entered into contracts in 1942–1944 was the that no coal, gas, oil, or other mineral deposits existed under the condemned properties that would support exploration or operations at that time and this "basic assumption" had a material effect on the agreed exchange of performance such that the resulting imbalance in the agreed exchange is so severe that Plaintiffs cannot fairly be required to carry it out. *See* Restatement (Second) of Contracts § 152 (1981).

The relief requested is for restitution. *Id.* § 152(2); *see also* Restatement of Restitution § 1.

Marzulla & Marzulla, P.A. (1350 Connecticut Avenue, N.W., Suite 410, Washington, D.C., 20036) is appointed as lead class counsel. *See* RCFC 23(c)(1)(B). Wyatt, Tarrant & Combs, LLP (500 West Jefferson Street, Suite 2800, Louisville, Kentucky, 40202–2898) is appointed as class counsel to assist Marzulla & Marzulla, P.A., as they direct. *Id.*

On Monday, July 31, 2006, the parties will file a Joint Status Report indicating whether any further action is required in this case to meet the class notice requirements of RCFC 23(c).

**IT IS SO ORDERED.**