**LAND GRANTORS IN HENDERSON, UNION, and WEBSTER COUNTIES, KENTUCKY and their Heirs, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 93–648X.

United States Court of Federal Claims.

Dec. 14, 2006.

Nancie G. Marzulla, and Roger J. Marzulla, Marzulla & Marzulla, Washington, D.C., Mark Stephen Pitt, Wyatt Tarrant & Combs, LLP, Louisville, Kentucky, for plaintiffs.

William James Shapiro, Sacramento, California, for defendant, United States Department of Justice.

## SECOND INTERIM REPORT, MEMORANDUM OPINION, AND ORDER

BRADEN, Judge and Hearing Officer.

### I. Background Statement.[1]

Shortly after the onset of World War II, the United States ("Government") acquired approximately 35,849.28 acres of land in the counties of Henderson, Union, and Webster, Kentucky to establish an Army training facility, that later was named Camp Breckinridge. Almost all of this property was owned by farmers who resided on the land, that had been in their families for generations and, more importantly, on which they depended for their livelihood. On March 7, 1942, the Secretary of War authorized the first of six condemnation proceedings filed in the United States District Court for the Western District of Kentucky during 1942–1944. Once property judicially was condemned, the landowners either could voluntarily negotiate a sale price with federal agents or demand "just compensation" to be determined by a jury trial. The Government paid the landowners approximately $3,107,341 for fee simple in all of the condemned properties, whether the price was negotiated or determined by a jury.[2]

By June 1951, the Department of Defense ("DOD") became aware that substantial gas and oil reserves may be located under the condemned properties and transferred oversight of these reserves to the Department of the Interior ("DOI").[3] In August 1956, DOI's Geological Survey Office confirmed the existence of substantial oil and gas reserves under the condemned properties that were being drained by producing wells adjacent to Camp Breckinridge. On March 15, 1957, two former landowners of this property sent a letter of protest to DOI when they learned that the agency planned to lease a tract of 190 acres on the east boundary of Camp Breckinridge, in order to protect the United States against loss from the drainage of the oil and gas deposits from adjoining properties. *See* DX 158 (March 15, 1957 letter from Dr. W.H. Puryear and A.G. Pritchett to DOI regarding a "Protective Lease of Oil and Gas Lands ... covering 190 acres ... in Henderson County, Kentucky"); *see also* DX 159 (March 25, 1957 letter from DOI to Congressman William H. Natcher responding to a March 11, 1957 letter from Congressman Natcher concerning DOI's intended auction of the 190 acres). The former landowners demanded that they receive the lease royalties and the right to repurchase their land, if it was declared surplus property. *See* DX 159 at DOJ1527. DOI summarily dismissed their protest. *See* DX 40 at DOJ0312 ("The department would be remiss in its duty ... if the issuance of an oil and gas lease for this 190–acre tract were withheld. Accordingly, the protests against the leasing of this land are hereby dismissed."). On May 1, 1957, the Government leased the oil and gas rights on the 190–acre tract to Felmont Oil Corp. *See* DX 183 (Ex. 73) at DOJ3440–50 (lease between the Government and Felmont Oil Corp.). On December 1, 1957, the Government entered into another "Protective Lease" with Kingwood Oil Company for the oil and gas rights on a separate 700 acre parcel "in the Camp Breckinridge Military Reservation in Union and Henderson Counties, Kentucky[.]" *See* DX 183 (Ex. 74) at DOJ3451–61 (lease between the Government and Kingwood Oil Company). Subsequently, DOI received at least $1,989,856 in revenues from these leases during the period August 6, 1957—April 30, 1964 and September 1983—March 2005.[4]

---

1. The background statement is derived in substantial part from the court's April 1, 2005 Interim Report re: S. 794 and Memorandum Opinion. *See Land Grantors in Henderson, Union, and Webster Counties, Kentucky v. United States,* 64 Fed.Cl. 661, 666–85 (2005) *("Land Grantors I").*

2. *Compare* DX 64 at DOJ1198–99 (Nov. 2, 1962 Department of Army Disposal Report No. 92 stating that Camp Breckinridge consisted of 35,-849.28 acres acquired in fee simple for $3,107,341, plus $2,500 for easements on an additional 93 acres) *with* DX 77 at DOJ3463

(Nov. 26, 1962 Report of Excess Real Property stating that Camp Breckinridge consisted of 35,-684.99 acres); June 9, 2004 Def. Response to Plaintiffs' Requests for Admission 22 at 11 ("Admit that the United States paid the total sum of $3,098,700.76 in acquiring the Property.").

3. *See* June 9, 2004 Def. Response to Plaintiffs' Requests for Admission 27 at 12.

4. *See* DX 183 (Ex. 80) at DOJ3569; *see also* JX 54 at DOJ1552; Ct. Ex. 5 (May 23, 2005 Declara-

In December 1962, DOD declared Camp Breckinridge inactive and the land, together with the coal, gas, oil, and other mineral rights, were transferred to the General Services Administration ("GSA") for disposal as surplus property. On or about April 15, 1965, GSA sold the coal rights in 30,540 acres to the Tennessee Valley Authority ("TVA") for $7,410,000.[5] In addition, GSA sold all of the gas, oil, and other mineral rights underneath the condemned properties to private companies for at least $24,002,246.06.[6] Former landowners still living in the area were outraged when they learned that the Government was profiting from selling coal, gas, oil, and other mineral rights, in light of the fact that they were paid nothing or a de minimus amount for existing leases when their land was condemned in 1942–1944. This situation provoked one former landowner to file an ill-fated suit in the United States District Court for the Western District of Kentucky, on behalf of himself and other former landowners that was dismissed on jurisdictional grounds. The appellate court correctly upheld the trial court's jurisdictional ruling, because the suit was improperly filed pursuant to the Surplus Property Act of 1944, 58 Stat. 765, a law that was repealed by the Federal Property and Administrative Services Act of 1949, 40 U.S.C. § 471, et seq., well before the suit was filed. See Higginson v. United States, No.2074 (W.D.Ky. Sep. 7, 1965) (unpublished), 384 F.2d 504 (6th Cir.1967), cert. denied, 390 U.S. 947, 88 S.Ct. 1034, 19 L.Ed.2d 1137 (1968). Because the trial court disposed of the case on jurisdictional grounds, however, the request for class certification was not considered, nor was any discovery allowed. On or about August 24, 1967, GSA also sold coal rights on an addi-

tion of Linda Lautigar, Enforcement Specialist, Department of Interior referencing Lease No. 044–0502123–06). The Government has stated that these leases were transferred to other entities, but has not produced documents that show the name of the transferee or how much additional revenue the Government received after April 30, 1964. See Gov't May 26, 2004 Answer to Interrogatory 8 at 12; see also William J. Shapiro Declaration, Ex. B at 2 (July 2, 2004 Certificate of Michael Dennis Daugherty, Attorney Advisor, Division of Mineral Resources, Office of the Solicitor, United States Department of the Interior stating "The Document Management Unit of the Department's Executive Secretariat assisted in ... redacting ... information concerning the sales value of oil and gas production that is privileged commercial information confidential to the producers.").

5. See Gov't Resp. at Tab A, Land Grantors v. United States, No. 93–468 (Fed.Cl. Mar. 31, 2005) (GSA Real Property Disposal Activities Control No. D–KY–432B indicating the sale of coal rights on Tracts 2,3,4,5,6,7,8 representing that 30,590 acres was awarded to the Tennessee Valley Authority on July 9, 1965 for $7,410, 000); see also JX 58 at DOJ1581 (September 7, 1979 letter from James W. Peck, District Engineer, Army Corps of Engineers to Congressman Carroll Hubbard stating that GSA offered all mineral rights and 36,-000 of land for sale in an auction on April 15, 1965); DX 183 (Ex. 82) at DOJ3575 (Bids Exceed $30 Million For Oil, Coal Rights At Camp, STURGIS NEWS, April 22, 1965) ("Coal rights bids by the Tennessee Valley Authority totaled $7,410,000, which makes it appear that the right to the coal deposits will go to this government agency"); DX 183 (Ex. 84) at DOJ3576 (TVA Coal Bids $5.7 Million High, THE UNION COUNTY ADVOCATE, April

22, 1965) ("Tennessee Valley Authority ... was the high bidder for 26,600 acres of coal rights underlying the Camp Breckinridge reservation.").

6. Compare JX 48 at DOJ1537 (Jan. 18, 1965 letter to Representative Edward J. Gurney from Lawson B. Knott, Jr., GSA Administrator stating: "The major portion of the mineral rights at Camp Breckinridge was offered for sale by sealed bid offering with the bid opening on April 15, 1965. The high bids received as a result of the offering total $31,982,547.70.") with June 9, 2004 Def. Response to Plaintiffs' Request for Admissions No. 23 at 11 ("Admit that the United States sold the oil, gas and coal rights underlying the property for an aggregate sum of $31,752,544"), with June 11, 2004 Def. First Supp. Response to Plaintiffs' Requests for Admission No. 23 at 2 ("Based on the October 20, 1965 Form # 1686, prepared by the Government Services Administration ... the oil and gas rights were sold for an aggregate sum of $24,433,247 and the total coal rights were sold for an aggregate of $7,410,000. Hence, based on this document, the total for oil, gas, coal minerals was $31,843,247."); with June 9, 2004 Def. Response to Pl. Requests for Admissions No. 23 at 11 (stating that the "oil, gas and coal rights underlying the property [were sold] for an aggregate sum of $31,752,544."); with Gov't Resp., Land Grantors v. United States, No. 93–468 (Fed.Cl. March 31, 2005) at TAB A (GSA Real Property Disposal Activities Control No. D–KY–4328 indicates that oil, gas, and other mineral rights were awarded on July 9, 1965 and sales were completed between October 15, 1965 and November 8, 1965 in the amount $24,002,246.06 and the coal rights to Tracts 2, 3, 4, 5, 6, 7, and 8 were sold for $7,410,000 for a total of $31,412,246).

tional 3,930 acres of the condemned properties.[7]

The manner in which GSA sold the condemned property angered many of the former landowners, particularly those who were under the impression that the Government had promised to give them a right of first refusal, if the land was ever sold. To add insult to injury, the Government did not even attempt to provide individual notice to the former landowners of any of these events, even though members of Congress were promised that would occur. The reality is that the former landowners either did not know their farms could be repurchased or financially were prohibited from bidding, because GSA put the most desirable agricultural properties up for sale in parcels much larger than the size of the original farms. Between May 28, 1956—November 15, 1968, GSA sold the surface rights to 31,963 acres of the condemned properties for approximately $5,972,950. *See* DX 183 (Ex. 85) at DOJ3580–82.

Sometime in 1968, following the United States Supreme Court's denial of *certiorari* in the *Higginson* case, a group of former landowners and/or their heirs formed the Breckinridge Land Committee and turned to Congress to seek redress. After thirty-five years of effort, on April 19, 1993, S. 794 was introduced "[f]or the relief of land grantors in Henderson, Union, and Webster Counties, Kentucky, and their heirs." On October 19, 1993, S. 794 and together with S. Res. 98 (Resolution, Calendar No. 204) 103d Congress, 1st Session (Sept. 20, 1993) successfully were reported out of the United States Senate and forwarded as a Congressional Reference to the Chief Judge of the United States Court of Federal Claims.

S. 794 provided, in relevant part:

Section 1. Authorization.

The Secretary of the Treasury is authorized and directed to pay, out of money not otherwise appropriated, to the individuals (and in any case in which such individual is deceased, the heirs of such individual) who sold their land in Henderson, Union, and Webster Counties, Kentucky, to the United States Government under threat of condemnation in order to provide the 35,-684.99 acres necessary for the military training camp known as Camp Breckinridge, the sum of $_____, such sum being in full satisfaction of all claims by such individuals against the United States arising out of such sale.

Section 2. Reason for Relief.

The individuals described in Section 1 assert that they were—

(1) promised they would be given priority to repurchase land sold by them if sold by the United States Government; and

(2) paid less than reasonable value due in part to the refusal of the United States Government to compensate the owners for mineral, oil and gas rights.

S. 794, 103d Cong. (1993).

## II. Report On Proceedings After The Court's April 1, 2005 Interim Report and Memorandum Opinion.[8]

On April 1, 2005, the court dismissed all claims arising under S. 794, Section 2(1), 103d Cong. (1993). *See Land Grantors I*, 64 Fed.Cl. at 697–702. Nevertheless, despite the unavailability of first-hand witnesses due to death or ill-health and the Government's claim that it no longer possessed a substantial number of relevant documents, the court held that the documents that were introduced by the Government at trial or in the public domain, as well as the testimony of the Government's experts, established by a preponderance of evidence that the 1942–1944 contracts were based on a mutual mistake that no coal, gas, oil, or other mineral deposits existed under the condemned properties that would support exploration or operation. *Id.* at 703–08 (discussing each element of

---

7. The Government claims that it has no documents that provide the name of the entity that purchased these rights or the amount of revenue received from this sale. *See* Court Ex. 3A; *see also* Court Ex. 3I.

8. The history of this proceeding from October 19, 1993 until August 15, 2003, the date the undersigned judge was assigned to this matter, and proceedings from August 15, 2003 until issuance of the court's April 1, 2005 Interim Report and Memorandum Opinion was set forth in detail in *Land Grantors I*, 64 Fed.Cl. at 685–88.

RESTATEMENT (SECOND) OF CONTRACTS (1981) ("RESTATEMENT") § 152 (allowing avoidance of contract "by the adversely affected party of [a] mistake . . . as to a basic assumption on which the contract was made, if it had a material effect in the agreed exchange of performances, and if the [adversely affected party] does not bear the risk of the mistake." *Id.* Int. Note at 379–80)). Consequently, Plaintiff was afforded the opportunity to file a Second Amended Complaint to conform to evidence introduced at trial by the Government supporting a claim of mutual mistake. *Id.* at 703–08 (citing RCFC 15(b); RESTATEMENT §§ 152, 154(a), (c)). In addition, the parties were ordered to show cause why the court should not exercise jurisdiction, pursuant to 28 U.S.C. § 1491(a)(1), enter a Final Judgment, and stay issuance of the reference. *See Land Grantors I,* 64 Fed.Cl. at 718.

On October 3, 2005, Plaintiffs filed a Second Amended Complaint, invoking the court's jurisdiction under the Tucker Act, 28 U.S.C. § 1491, as well as the congressional reference statutes, 28 U.S.C. § 1492 and 28 U.S.C. § 2509.

On October 3, 2005, Plaintiffs also filed a Status Report to advise the court of an unsuccessful August 18, 2005 settlement meeting with staff lawyers at the Department of Justice and a meeting Plaintiffs initiated with staff of the Senate Judiciary Committee regarding issues raised in the April 1, 2005 Show Cause Order. In addition, on October 3, 2005, Plaintiffs filed a Response to the court's April 1, 2005 Show Cause Order. On that date, the Government also filed a Response.

On October 18, 2005, the Government filed an Answer to the Second Amended Complaint. On October 21, 2005, the Government filed an Opposition to the Second Amended Complaint. On November 9, 2005, Plaintiffs filed a Response. On November 18, 2005, the Government filed a Reply.

On December 15, 2005, the court ordered the Government to provide supplemental documentation in further response to the Court's March 25, 2005 Order requesting the amount of royalties received by DOI Leases No. 044–050219–0 and Lease No. 044–044315–0, as well as documents evidencing the sale of coal rights to Tracts 1, 7A, and 7B. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 331–32, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) (a decision to reopen the record "to submit additional proof is addressed to [the trial court's] sound discretion."). On December 23, 2005, the Government provided affidavits from: Ms. Linda Lautigar, Enforcement Specialist, Department of the Interior, Minerals Management Service; Mr. Robert Doyle, Deputy Director of the United States Geological Survey; as well as statements from Mr. James B. Hall, Office of General Counsel, Tennessee Valley Authority; Mr. Richard B. Mayhugh, Real Estate Specialist, General Services Administration; and Mr. Timothy Best, Land Examiner, Bureau of Land Management. All of these federal officials represented that they were not aware of any additional documents responsive to the court's request. *See* Gov't Resp., *Land Grantors v. United States,* No. 93–468 (Fed.Cl. Dec. 23, 2005) at 2–3, Tab A, Tab B. Ms. Lautigar and Mr. Doyle speculated that any relevant documents previously housed at their agencies were destroyed, pursuant to agency document retention policies. *Id.* Apparently, an index of the documents destroyed also does not exist.

On December 29, 2005, the court issued an Order to request the parties' views regarding reconsideration of Judge Merrow's December 23, 1997 Order Denying Class Action Certification, since the Second Amended Complaint continued to assert that this case was a class action. *See* Second Amended Compl. ¶ 6 ("The Claimants bring this action as representatives of a class of former landowners[.]"). On January 31, 2006, Plaintiffs filed a motion requesting that the court reconsider the December 23, 1997 Order denying class certification.[9]

---

9. On February 14, 2006, the Government filed a Motion to Strike Plaintiff's January 31, 2005 Motion for Reconsideration. On March 2, 2006, Plaintiffs filed a Response. On March 16, 2006, the Government filed a Reply. On May 18, 2006, the Government filed an Opposition to Plaintiff's Motion for Reconsideration of Class Action Certification. On June 2, 2006, Plaintiffs filed a Reply.

On January 31, 2006, the Government also proffered the Declaration of James H. Edgar, in response to the court's December 15, 2005 Order for supplemental documentation. Mr. Edgar is the Properties Specialist assigned to the Coal Acquisition and Supply Unit of the Tennessee Valley Authority. Mr. Edgar provided the court with coal leases and/or amendments entered into between TVA and the Peabody Coal Company on February 7, 1969, June 9, 1977, May 1, 1981, November 17, 1985, and November 15, 1989, however, he was unable to locate "any document that shows the total amount of royalties (if any)" paid pursuant to these leases. *Id.* at 2.

On April 27, 2006, Plaintiffs *sua sponte* proffered: a map overlaying the boundaries of the original property owners tracts atop the boundaries of the ten large "mineral tracts" disposed of by the Government; a Declaration from William Mattingly, a Principal at Coulter Mapping Solutions; an April 7, 2006 Affidavit from Charles F. Haywood, one of Plaintiffs' expert witnesses, allocating the total dollar amount received by the Government for the sale of the mineral rights to each of the original tracts; and a second Affidavit from Mr. Haywood suggesting a method for estimating the Government's royalty receipts on those mineral leases for which no documents can be located. On May 10, 2006, the Government filed a Motion to Strike the April 7, 2006 Haywood Affidavits. On May 16, 2006, the Government filed a Motion to Strike Plaintiffs' April 27, 2006 filing *en toto.* On May 30 2006, Plaintiffs filed a Response. On June 12, 2006, the Government filed a Reply.

On June 22, 2006, the Court issued a Memorandum Opinion and Order granting Plaintiffs' Motion for Class Certification and appointing the law firm Mazulla & Mazulla as Class Counsel. *See Land Grantors v. United States,* 71 Fed.Cl. 614 (2006) *("Land Grantors II").* On August 2, 2006, the parties filed a Joint Status Report that was supplemented by Plaintiffs on August 25, 2006. On August 25, 2006, the Government filed a "Request To Approve Proposed Class Action Notice and Proposed Request to Join Class." To date, Plaintiffs have not responded to the Government's Request.

### III. Discussion.

Assuming that the court exercises jurisdiction under 28 U.S.C. § 1491 and stays the congressional reference,[10] the court must ad-

---

10. This case is not the first where the court has been presented with claims asserted under both congressional reference and Tucker Act jurisdiction. In fact, in *Benson v. United Sates,* 141 Ct.Cl. 273, 1958 WL 7323 (1958) the Court of Claims set forth the proper procedure in the event that dual jurisdiction is invoked:

Under the court's rules, Congressional reference cases are heard and determined as adversary litigation. The issues are joined in standard pleadings. Trials are subject to the rules of evidence. The record becomes the foundation for findings of fact. Conclusions are drawn from the application of the law to the facts. *Judgment may follow if the court has the requisite power in a particular case. Otherwise, its conclusions are reported to Congress.*

*Id.* at 277–78 (emphasis added); *see also Hardeman—Monier—Hutcherson v. United States,* 198 Ct.Cl. 472, 458 F.2d 1364, 1373 (1972) (Court of Claims held plaintiff was not entitled to relief based on a changed conditions clause, but was entitled to damages for breach of contract, without mentioning a pending congressional reference case for equitable relief.)

Subsequently, in *Mocatta & Goldsmith, Ltd. v. United States,* Slip. Op., Cong. Ref. Case No. 7–70 (March 31, 1976), a Trial Commissioner of the Court of Claims held that:

The purpose of the Congressional Reference mechanism set forth in 28 U.S.C. § 2509 is to provide one who believes that he [she] has been wronged by the Government with a means of redress where either the injury complained of, though genuine, is one for which the *law affords no remedy,* or where the claimant has excusably failed to timely pursue an established and adequate legal remedy that once was available to him [her]. *The device is not, however, intended as an optional alternative avenue of relief for an aggrieved party who can state an enforceable legal claim against the government in respect to his alleged injury,* but who is not fully confident that he can prevail in litigation of the merits of that claim.

*Id.* at 2–3 (emphasis added). In that case, the Trial Commissioner issued an opinion that the claimants had established a legal remedy and no action was taken pursuant to reference jurisdiction.

Subsequently, the Chief Commissioner issued an Opinion and Order granting the Government's motion to suspend the Congressional Reference prior to issuing final ruling on Plaintiff's legal action:

*Should the court find that it does not have a legal course of action,* then future proceedings in the Congressional Reference cases will be

dress two other threshold jurisdictional issues. First, when did Plaintiffs' mutual mistake claim accrue. And, second, whether the doctrine of equitable tolling stays the Tucker Act's six year statute of limitations. *See* 28 U.S.C. § 2501.

Assuming *arguendo* that all of Plaintiffs' claims accrued so that the Tucker Act's six-year limitation applies, the court must determine whether the doctrine of equitable estoppel bars the application of the statute of limitations.

In *American Pipe & Const. Co. v. Utah,* 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), the United States Supreme Court held, in a case between private litigants, that "the mere fact that a federal statute providing for substantive liability also sets a time limitation upon the institution of suit does not restrict the power of the federal courts to hold that the statute of limitations is tolled under certain circumstances not inconsistent with the legislative purpose." *Id.* at 559, 94 S.Ct. 756.

Subsequently, in *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990), the United States Supreme Court, in an opinion delivered by Chief Justice Rehnquist, held that "a more general rule [should] govern the applicability of equitable tolling in suits against the Government." *Id.* at 95, 111 S.Ct. 453. Therefore, even where Congress has waived sovereign immunity, United States Supreme Court has held that the "same rebuttal presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the Government." *Id.* at 95–96, 111 S.Ct. 453; *but see Brice v. Secretary of Health and Human Services,* 240 F.3d 1367

(Fed.Cir.2001) (holding that equitable tolling should not apply where "the relevant limitations statute manifested congressional intent to preclude tolling."). The United States Supreme Court, however, invited "Congress ... [to] provide otherwise if it wishes to do so." *Irwin,* 498 U.S. at 96, 111 S.Ct. 453. Congress has amended the Tucker Act on thirteen occasions since this law was enacted in 1887.[11] On no occasion has Congress expressed any intent to bar application of the doctrine of equitable tolling in Tucker Act suits against the Government.

Nevertheless, in *Martinez v. United States,* 333 F.3d 1295 (2003), the United States Court of Appeals for the Federal Circuit in an *en banc* decision[12] candidly admitted:

*[W]e have not decided whether equitable tolling applies with respect to the general statute of limitations for Tucker Act claims, 28 U.S.C. § 2501. In fact, we have recently declined to decide "whether equitable principles may ever toll the statute of limitations codified in § 2501." Frazer v. United States, 288 F.3d 1347, 1353 (Fed. Cir.2002).* To be sure, section 2501 appears to have more in common with the statute of limitations in *Irwin* than with the statutes at issue in *[United States v.] Brockamp* [519 U.S. 347, 350, 117 S.Ct. 849, 136 L.Ed.2d 818 (1997) ] and *[United States v.] Beggerly* [524 U.S. 38, 48–49, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998) ]. Actions under section 2501 are, by definition, for money damages and thus have much in common with ordinary actions at law between private parties. Moreover, unlike the tax statute in *Brockamp,* section 2501

required to determine if it has an equitable claim.
*Mocatta & Goldsmith, Ltd. v. United States,* Slip. Op., Cong. Ref. Case No. 7–70 (May 24, 1976) at 6.

**11.** *See* Jun. 27, 1898, 30 Stat. 494; Jul. 1, 1898, 30 Stat. 649; Mar. 3, 1911, 36 Stat. 1136; Jun. 10, 1921, 42 Stat. 24; Jun. 25, 1948, 62 Stat. 940; Jul 28, 1953, 67 Stat. 226; Sep. 3, 1954, 68 Stat. 1241; Jul. 23, 1970, 84 Stat. 449; Aug. 29, 1972, 86 Stat. 652; Nov. 1, 1978, 92 Stat. 2391; Oct. 10, 1980, 94 Stat. 1743; Oct. 29, 1992, 106 Stat. 4516; Oct. 19, 1996, 110 Stat. 3874.

**12.** The opinion for the court was filed by Circuit Judge Bryson, in which Circuit Judges Michel, Lourie, Clevenger, Rader, Schall, and Prost jointed; and in which Circuit Judge Newman, Linn, and Dyk joined with respect to Parts I, II, III, V (regarding application of equitable tolling), and VI. A dissenting opinion was filed by Senior Circuit Judge Plager, in which former Chief Judge Mayer, Circuit Court Judges Newman, Gajarsa, Linn, and Dyk joined (arguing that the statute of limitations begins to run from the time an adverse decision is made under a statute or regulation). *See Martinez,* 333 F.3d at 1320–1329 *(en banc)* (Plager, J., dissenting).

is not highly technical and was not designed to apply exclusively to a complex administrative program in which equitable tolling could be disruptive. On the other hand, section 2501 differs from the *Irwin* statute in that it contains its own tolling provision for persons "under legal disability or beyond the seas at the time the claim accrues," a factor that the [United States Supreme] Court in *Brockamp* regarded as weighing against recognizing other nonstatutory exceptions to the limitations period. *See Brockamp*, 519 U.S. at 351–52, 117 S.Ct. 849, 136 L.Ed.2d 818. Because the matter is not free from doubt, we follow the same course here that we followed in *Frazer: We decline to decide whether equitable tolling is generally available under section 2501[.]*

*Id.* at 1318 (emphasis added).

The Second Amended Complaint in this case has invoked the court's Tucker Act jurisdiction. Therefore, the court cannot simply decline to decide whether the presumption of equitable tolling applies to 28 U.S.C. § 2501, since such an action could deny Plaintiffs the ability to pursue a legal claim with due process implications. The court is obligated to decide whether the *Irwin* presumption of equitable tolling applies to Tucker Act claims, which then may be affirmed, modified, or reversed by the appellate courts.[13]

On June 22, 2005, the United States Court of Appeals for the Federal Circuit issued a decision that applied the *Irwin* presumption of equitable tolling to afford Plaintiff–Appellant a Merit Systems Protective Board hearing to pursue a Veterans Employment Opportunity Act ("VEOA") claim. *See Kirkendall v. Dep't. of the Army*, 412 F.3d 1273, 1275–78 (Fed.Cir.2005). In a dissenting opinion, however, Circuit Court Judge Dyk argued that subsequent United States Supreme Court decisions in *Brockamp* and *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 360–63,

111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) supplanted the *Irwin* presumption of equitable tolling in VEOA cases, because Congress' intent to preclude equitable tolling in these cases was evidenced by the language of the statute as well as the short 15–day limitations period in the statute. *See Kirkendall*, 412 F.3d at 1280–82 (Dyk, J., dissenting) ("Thus, the use of emphatic language is indicative of congressional intent to foreclose equitable tolling. In contrast to the statute at issue in *Bailey [v. West*, 160 F.3d 1360 (Fed.Cir.1998)], the language of [the VEOA] is sufficiently emphatic to rebut any presumption of equitable tolling."). On August 25, 2005, the Government filed a Combined Petition for Panel Rehearing and Suggestion of Rehearing *En Banc*.

On January 3, 2006, the United States Court of Appeals for the Federal Circuit granted the Government's petition for *en banc* review, vacated the panel decision, and invited briefing. On November 9, 2006, the United States Court of Appeals for the Federal Circuit held oral argument, where the broader issues of claim accrual and application of the *Irwin* presumption of equitable tolling were dominant themes.

In light of the significance of the recent *en banc* consideration of the doctrine of equitable estoppel and relevance to this case, the court has determined that the interests of justice require deferral of a final disposition in this case until the *en banc* decision in *Kirkendall* is issued and final.[14] At that time, the court will issue a Memorandum Opinion and Order, pursuant to 28 U.S.C. § 1491, and request that the parties provide their views as to whether the presumption of equitable tolling set forth by the United States Supreme Court in *Irwin* applies to the Tucker Act; and whether the court's disposition thereof should be certified for interlocutory appeal. *See* 28 U.S.C. § 1292(d)(2).

---

**13.** Issuing a Final Report, pursuant to the congressional reference jurisdiction, would afford Plaintiffs no enforceable right to relief, since the effect, even if adopted by the reviewing panel, would result only in a recommendation for a congressional appropriation.

**14.** Since Mr. Theodore B. Olson, a former Solicitor General of the United States, has assumed representation of Plaintiff–Appellant in *Kirkendall*, the court assumes that a petition for *certiorari* may be filed, if the holding of the original panel decision is not adopted *en banc*.

It is a tragedy that the original claimants in this case apparently are now dead, without a final resolution of this matter. Their heirs, the Plaintiffs in this case, however, are entitled to an adjudication of their legal claim, which will take additional time. With this in mind, the court has reviewed the file in *Rosner et al. v. United States,* a recent case that shares similarities to this case in terms of historical importance. *See* Final Order and Judgment, *Rosner et al. v. United States,* No. 01–1859 (S.D.Fl. Sept. 30, 2005); *see also* The Hungarian Gold Train Settlement, http://www.hungariangoldtrain.org/index_en.asp (last visited December 12, 2006). In that case, plaintiffs alleged that the United States "violated various laws and regulations, including but not limited to breach of contract, the law of nations, the Constitution, and applicable military regulations, in its handling and disposition of the personal property on board the Hungarian Gold Train." *Id.* The Hungarian Gold Train "contained personal property which was taken, seized, confiscated or stolen by the Hungarian government from Hungarian Jews" and that subsequently was seized by the United States on or about May 11, 1945, shortly after the conclusion of hostilities in Europe during World War II. *Id.* The United States did not return this property to the original owners.

During the course of the *Rosner* litigation, the Honorable Patricia A. Seitz, appointed Mr. Fred F. Fielding, former Counsel to the President of the United States (1981–1986) and currently a partner in the Washington, D.C. law firm of Wiley, Rein and Fielding, to serve as mediator in that case. *See* Joint Notice of Agreement to a Mediator, *Rosner et al. v. United States,* No. 01–1859 (S.D. Fl. June 9, 2004) (affirming that the Department of Justice agreed to have Mr. Fielding serve as mediator, but requesting an extension of the mediation deadline, to avoid any conflict with Mr. Fielding's service on the National Commission on Terrorist Attacks Upon the United States); Order Granting Joint Motion, *Rosner et al. v. United States,* No. 01–1859 (S.D. Fl. June 15, 2004) (same).

With Mr. Fielding's assistance, on April 29, 2005, the parties entered into a Settlement Agreement establishing a $25.5 million fund. Approximately $21 million, was reserved to provide social services and humanitarian relief for eligible Jewish Hungarian Nazi victims. *See* Final Order and Judgment at 4, *Rosner et al. v. United States,* No. 01–1859 (S.D.Fl. Sept. 30, 2005). An additional $500,000 will be used by a recipient institution for "identifying, acquiring, microfilming, cataloguing and making available an archival collection of documents and artifacts, for scholarly research and educational purposes, as well as acquiring artifacts, for the use and benefit of the Settlement Class, relating to the history of the Hungarian Gold Train and the looting of the Hungarian Jewish community during World War II." *See* Settlement Agreement at 15, *Rosner et al. v. United States,* No. 01–1859 (S.D.Fl. Apr. 29, 2005). The remainder of the fund was designated for attorney's fees and various administrative expenses. *Id.* at 13–14.

Appendix H to the Rules of the United States Court of Federal Claims ("RCFC, Appendix H") authorizes the court to utilize alternative dispute resolution by mediation conducted by a third-party neutral. *See* RCFC, Appendix H 1, 2(d). The court has provided Mr. Fielding with *Land Grantors I* and ascertained his willingness to serve as a mediator in this case.

### III. Conclusion.

Given Mr. Fielding's extraordinary and unique qualifications, prior acceptance by the Department of Justice as a qualified mediator, and demonstrated ability successfully to mediate cases of enormous complexity and historic importance, the court hereby orders the parties to inform the court, no later than January 31, 2007, whether they consent to the designation of Mr. Fielding as a Mediator in this case, and an appropriate time period for the court to stay this proceeding to ascertain whether a settlement may be achieved.

In light of the genesis of this unique proceeding, the court is forwarding a copy of this Second Interim Report, Memorandum Opinion, and Order to the attention of: United States Attorney General, Alberto R. Gonzales; United States Senator for Kentucky Mitch McConnell; United States Senator for

Kentucky Jim Bunning; United States Representative for Kentucky's First District; Edward Whitfield; and ranking members of the United States Senate Judiciary Committee, Senator Arlen Specter and Senator Patrick J. Leahy.

**IT IS SO ORDERED.**

**COURT ADDENDUM[1]**

The following summarizes the revenues, identified as of November 30, 2006, that the Government received from the sale, lease, or easement of coal, oil, gas, and other mineral rights that previously were the property of the Plaintiffs in this case:

1. DOI–Felmont Oil Leases
   August 6, 1957–April 30, 1964

   April 31, 1964–August 31, 1983
   September 1983–March 2005

   | | | |
   |---|---|---|
   | $ | 272,883.00 | royalties[2] |
   | $ | 432,236.00 | bonus[3] |
   | $ | unknown[4] | |
   | $ | 70,718.24 | royalties[5] |

2. DOI–Kingwood Oil Company Leases
   January 19, 1960–April 30, 1964

   April 30, 1964–August 31, 1983
   September 1983–March 2004

   | | | |
   |---|---|---|
   | $ | 418,443.00 | royalties[6] |
   | $ | 708,253.00 | bonus[7] |
   | $ | unknown[8] | |
   | $ | 86,723.58 | royalties[9] |

3. July 9, 1965 GSA Award of Gas, Oil And Other Mineral Rights
   Tract 1–Sun Oil & Texas Gas Exploration
   Tract 2–Texaco, Inc. (Tulsa)
   Tract 3–Eastdil Corp.
   Tract 4–Eastdil Corp.

   | | |
   |---|---|
   | $ | 29,481.00[10] |
   | $ | 7,613,000.00 |
   | $ | 7,260,324.00 |
   | $ | 48,076.06 |

1. Most of this information was produced to Plaintiffs in discovery, but was obtained from the Government by the Court after March 2, 2005. In fairness to the Government, Plaintiff's Kentucky counsel never moved to compel production, although counsel was on notice by at least June 21, 2004 that the administrative record did not "constitute 'all documents in the Government's control pertaining to the subject matter of the congressional reference.'" *See* Decl. of William J. Shapiro, *Land Grantors v. United States,* No. 93–468 (Fed.Cl. Mar. 18, 2005) at 6 n. 1, Tab A. On receipt of the Shapiro Declaration the court was first advised of this fact and that approximately 1,000 pages of documents in the administrative record had not been provided to the court, without explanation or assertion of any privilege. *Id.* ¶ 67. The court, however, was assured that Government counsel did "not believe that any of those documents are relevant to the issues presented by this congressional reference." *Id.* ¶ 76. Although that may be true, those documents may well be relevant to the claims asserted in the October 3, 2005 Second Amended Complaint invoking the court's Tucker Act jurisdiction.

2. *See* DX 183 (Ex. 80) at DOJ3569; DX 182A at DOJ2699.

3. *See supra* note 2.

4. *See* Ct. Ex. 5 (May 23, 2005 Declaration of Linda Lautigar, Enforcement Specialist, Department of Interior, Minerals Management Service, Office of Enforcement) ("Lautigar Decl. I") (indicating that this information may be in records located at the Federal Records Center, Lakewood, Colorado–U.S. Geological Survey records); *see also* Def. Resp., *Land Grantors v. United States,* No. 93–468 (Fed.Cl. Dec. 23, 2005) at Tab B ("Lautigar Decl. II") (indicating that none of the records at the Federal Records Centers, in Lakewood, Colorado or Fort Worth, Texas–U.S. Geological Survey records contained this information).

5. *See* Lautigar Decl. I (referencing Lease No. 044–0502123–0).

6. *See* DX 183 (Ex. 80) at DOJ3569.

7. *See supra* note 6.

8. *See* Lautigar Decl. II (indicating that none of the records at the Federal Records Center, Lakewood, Colorado–U.S. Geological Survey records contained this information).

9. *See* Lautigar Decl. (referencing Lease No. 044–044315–0).

10. *See* Gov't Resp., *Land Grantors v. United States,* No. 93–468 (Fed.Cl. Mar. 31, 2005) at Tab A (GSA Real Property Disposal Activities Control No. D–KY–432B indicating that oil, gas, and other mineral rights were awarded on July 9, 1965 and sales were completed between October 15, 1965 and November 8, 1965); *see also* Decl. of Jay L. Brigham, *Land Grantors v. United States,* No. 93–468 (Fed.Cl. Apr. 12, 2005) at Tab 5 ("Bingham Decl.").

| | | |
|---|---|---|
| Tract 5–Allied Chemical Corp. | $ 1,011,274.00 | |
| Tract 6–Sun Oil & Texas Gas Exploration | $ 2,251,979.00 | |
| Tract 7–Eastdil Corp. | $ 1,664,112.00 | |
| Tract 7A–Cities Service Oil Co. | $ 56,249.00 | (rejected) |
| Tract 7B–Cities Service Oil Co. | $ 80,949.95 | (rejected) |
| Tract 8–Texaco Corp. | $ 4,124,000.00 | |

4. July 9, 1965 Sale of Coal Rights
   30,590 acres sold to TVA      $ 7,410,000.00[11]

5. August 24, 1967 Sale of Coal Rights      $ unknown[12]
   4,800 acres offered of former U.S. Army Garrison Camp Breckinridge. Purchaser unknown.

6. July 25, 1991 Coal Leases—Tract 7A      $ 470,976.54   royalties[13]
   Government lease to Peabody Coal Company for the   $ 501.00   rent[14]
   period July 1, 1991–June 25, 1993.

7. June 18, 2004 Short Form of Coal      $ unknown[15]
   Easement at Seam 11 from tracts located in former Camp Breckinridge

11. See Gov't Resp., *Land Grantors v. United States,* No. 93–468 (Fed.Cl. Mar. 31, 2005) at Tab A (GSA Real Property Disposal Activities Control No. D–KY–432B indicating sale of coal rights on Tracts 2,3,4,5,6,7,8 representing 30,590 acres was sold on July 9, 1965); *see also* JX 58 at DOJ1581 (September 7, 1979 from James W. Peck, District Engineer, Army Corps of Engineers to Congressman Carroll Hubbard advising that GSA offered all mineral rights and 36,000 of land for sale in an auction on April 15, 1965); DX 183 (Ex. 82) at DOJ3575 (*Bids Exceed $30 Million For Oil, Coal Rights At Camp,* STURGIS NEWS, April 22, 1965) ("Coal rights bids by the Tennessee Valley Authority totaled $7,410,000, which makes it appear that the right to the coal deposits will go to this government agency"); DX 183 (Ex. 84) at DOJ3576 (*TVA Coal Bids $5.7 Million High,* THE UNION COUNTY ADVOCATE, April 22, 1965) ("Tennessee Valley Authority ... was the high bidder for 26,600 acres of coal rights underlying the Camp Breckinridge reservation.").

12. See Gov't Resp., *Land Grantors v. United States,* No. 93–468 (Fed.Cl. Mar. 11, 2005) at Tab3–I.

13. See May 17, 2005 Mayhugh Decl. at 2; *see also* February 3, 2006 Declaration of Mr. Steve Gobat, Deputy State Director, Division of Natural Resources—Eastern States, Bureau of Land Management of the Department of the Interior, enclosing Exhibit A, a July 25, 1991 Coal Lease No. KYES 43034 with the Peabody Coal Company regarding the "Henderson County, Kentucky, The Camp Tract" for 167 acres at a 8% rate for value of any coal produced.

14. See *supra* note 13.

15. See Brigham Decl. at Tabs 4, 7 (referencing prior Grant of Coal Easements, dated June 9, 1977, as rendered by instruments dated May 1,1981, November 11, 1985, and November 15, 1989. This Coal Easement was transferred to TVA from GSA on June 29, 1967 and subsequently was leased to the Peabody Coal Company, subject to other agreements between TVA and the Sun Oil Company, TVA and Texaco, Inc., TVA and Ashland Oil and Refining Company, and TVA and the Kingwood Oil Company). The Government did not provide the Court with any of the above referenced "instruments" or Exhibits C, D, E, and F to the June 18, 2004 Coal Easement.